The PAINTSMITHS, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

and

Painters District Council No. 2, Intervenor-Respondent.

No. 79–1177.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 13, 1979.

Decided April 30, 1980.

Lawrence P. Kaplan, Suelthaus, Krueger, Cunningham, Yates & Kaplan, St. Louis, Mo., for petitioner.

Candace M. Carroll, Atty., N. L. R. B., Washington, D. C., argued, for respondent, John D. Burgoyne, Asst. Gen. Counsel, John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., on brief, for respondent.

William H. Bartley, Bartley, Goffstein, Bollato & Lange, Clayton, Mo., for intervenor-respondent, Dist. Council, etc.

Before STEPHENSON and McMILLIAN, Circuit Judges, and HANSON,* Senior District Judge.

STEPHENSON, Circuit Judge.

■ The PaintSmiths, Inc. (hereinafter the Company) petitions this court pursuant to section 10(f) of the National Labor Relations Act as amended, 29 U.S.C. § 160(f), for review of a decision and order of the National Labor Relations Board (the Board).[1] Proceedings in this case began when the General Counsel, upon the Company's filing of a charge, issued a complaint against District Council No. 2 of the Brotherhood of Painters and Allied Trades, AFL–CIO (hereinafter the Union). The complaint alleged that the Union had committed an unfair labor practice when it invoked its contractual power to appoint stewards when it knew the result would be the layoff of a regular Company employee. The administrative law judge (ALJ) upheld the

complaint, but the Board, on review, dismissed it. We disagree with the Board. We hold that a union cannot exercise its appointment of steward power to cause the layoff of a regular employee absent legitimate and substantial reasons for doing so, and conclude the Union has not made the required showing here. We therefore grant the Company's petition for review and direct the Board to enter the order recommended by the ALJ, as herein amended.

I. Background.

The facts underlying this case arose in early 1977 and are substantially undisputed. The Company, a painting subcontractor in the construction industry, did business at various jobsites in the St. Louis metropolitan area. The Company regularly employed a work force of approximately thirty painters, all of whom were members of the Union.[2] The collective bargaining agreement then in force provided in part:

Section 20—Stewards

It is agreed that the Union shall have the power to appoint job or shop stewards and the Employer agrees to employ such persons appointed as stewards for the enforcement of this Agreement and the decisions of the District Council whenever it deems such action to be necessary. Job stewards shall be appointed on all new work. On all overtime work where no job or shop steward has been appointed, overtime stewards shall be appointed to protect the Union's interest.

The ALJ found that the Union usually exercised its section 20 appointment power on large construction jobs involving new work. The ALJ further related that

[u]ntil the incident that developed on February 7, [1977,] the experience of the Company ha[d] been that the Union appointed a job steward at its jobs about two times per year. In each instance,

---

* The Honorable William C. Hanson, Senior United States District Judge for the Southern District of Iowa, sitting by designation.

1. The decision of the Board is reported at 239 N.L.R.B. No. 192 (1979) and [1978–79] NLRB Dec. (CCH) ¶ 15,457.

2. The Company-Union agreement provided that employees would become union members within eight days of their employment or upon the execution of the agreement, whichever was later.

according to Company President William Smith, the Company was able to use the extra man and did so as a favor to the [Union] business agent who made the request.

On January 4, 1977, the Union's business agent, Gregory Raftery, learned that the Company had won the painting contract on a new project, the North Gate Nursing Home. The ALJ found that as of January 4, Raftery knew of no trade rules violation on the part of the Company and had no reason to anticipate jurisdictional or other problems on the job. Nevertheless, Raftery informally asked the Company president, William Smith, to notify him before the job started so he could appoint a steward.[3] Raftery was not informed when the work began at the North Gate project on January 11 and no steward was designated.

On February 4, Raftery discovered three Company painters working at the North Gate project. Raftery observed that one of the painters was wearing a blue shirt, in violation of a Union trade rule that requires working painters to wear white uniforms.[4] Later that day, Raftery left a message at the Company that he would send a steward to the North Gate project on February 7, the next Monday.

On February 7, Raftery sent his brother, Richard Raftery, to the North Gate project as the designated steward. Richard Raftery was a member of the Union but was not a member of the Company's regular work force. The Company's foreman told Richard Raftery that the job was nearing completion and that there was no work for an additional painter. Gregory Raftery told the foreman that either Richard Raftery worked or no one worked. After discussing this development with the president of the

Company, the foreman hired Richard Raftery and laid off painter Steven Scheble. As a result of this incident, Scheble lost approximately sixteen hours of work. The Company discharged Richard Raftery at the end of the work day.

The next day, Gregory Raftery visited the North Gate project and informed the crew that, in view of the absence of a job steward, they were to stop working. Through the foreman, the Company suggested that Raftery appoint one of the crew as steward. Raftery rejected this suggestion, claiming that none of the crew was qualified to serve as a steward because none was willing to enforce the union trade rules. Raftery then shut down the job because no steward was on the job. That afternoon, the Company agreed to employ a steward appointed by the Union. Stewards appointed by Raftery from outside the Company's regular work force then served on the job until its completion.

Raftery's first steward appointee was scheduled to appear February 9 but did not show up because he was injured. The next appointee, Robert Harvarton, was married to Raftery's niece. Harvarton appeared for work on February 10 and served as steward on the North Gate project for several days before transferring to another job. Raftery next appointed Robert Lemp, who, Raftery testified, was one of Raftery's college buddies. Lemp served as steward until the completion of the project.

On February 14, 1977, the Company filed an unfair labor practice charge with the Board, alleging that the Union had caused the Company to discriminate against its employees in regard to terms and conditions of employment in order to encourage union membership in violation of section 8(b)(2) of

---

**3.** Agent Raftery testified that he and William Smith had a "fast conversation" as they were leaving a Joint Trade Board meeting, and that Smith "mumbled O.K." to Raftery's request for notification. Smith testified he recalled telling Raftery the job would begin the next week but did not recall that Raftery wanted to place a

steward on the job. The ALJ credited Raftery's testimony.

**4.** The job foreman and the other painter on the crew may have themselves been in violation of related work rules, the foreman for failing to enforce the white uniform rule, the other paint-

the National Labor Relations Act.[5] After a hearing, the ALJ found that the appointment-of-steward clause (section 20) was a valid contractual provision but, because the Union's appointment of a steward had resulted in the layoff of another employee, the clause had been unlawfully applied. The ALJ concluded that the Union had committed an unfair labor practice under section 8(b)(2) and recommended that the Union be ordered to pay Scheble for his lost work time and to desist from appointing any "shop steward not from the employer's regular work force or from among the employees already hired by such employer without legal and sufficient justification for such appointment." *District Council No. 2 of the Brotherhood of Painters & Allied Trades*, No. 14–CB–3469, slip op. at 12 (N.L. R.B. June 7, 1977).

The Board affirmed the ALJ's rulings and findings of fact but not his conclusions of law and recommendations.[6] The Board agreed that the appointment-of-steward clause was valid, but reversed the ALJ's conclusion that the clause had been unlawfully applied. The Board found that the Union's appointment of a steward from outside the Company's regular work force was in furtherance of legitimate union objectives under the collective bargaining relationship. The Board reasoned that because the Union "acted here for a legitimate aim, its actions, with their attendant results, did not violate the Act * * *." *District Council No. 2 of the Brotherhood of Painters & Allied Trades*, [1978–79] NLRB Dec. (CCH) ¶ 15,457 at 28,888 (239 NLRB No.

192) (1979) (hereinafter *Brotherhood of Painters*). The Board therefore dismissed the complaint.[7]

II. Analysis.

 In reviewing a Board decision we must determine whether the decision rests upon substantial evidence on the record as a whole and a correct application of the law. *E. g., Inter-Collegiate Press, Graphic Arts Div. v. NLRB*, 486 F.2d 837, 840 (8th Cir. 1973), *cert. denied*, 416 U.S. 938, 94 S.Ct. 1939, 40 L.Ed.2d 288 (1974). The substantial evidence standard of review applies even where the Board's decision has reversed that of the ALJ. Nonetheless, "the ALJ's opinion is * * * a part of the record against which the substantiality of the evidence supporting the Board's decision is measured." *Teamsters Local 20 v. NLRB*, 610 F.2d 991, 995 n. 5 (D.C.Cir.1979). This is particularly true where, as here, the Board has adopted the ALJ's credibility determinations and findings of fact but has drawn different conclusions of law.

Certain principles concerning a union's ability to secure employment preferences for union stewards are well established.

Section 8(a)(3) of the National Labor Relations Act prohibits employers from discriminating among employees with respect to "any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3) (1976). Section 8(b)(2) prohibits unions from causing or attempting to cause an employer to vio-

---

er for failing to report his fellow union member for painting out of uniform.

**5.** Section 8 of the National Labor Relations Act, 29 U.S.C. § 158, provides in part:
(a) It shall be an unfair labor practice for an employer—
 * * * * * *
 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *.
 * * * * * *
(b) It shall be an unfair labor practice for a labor organization or its agents—
 * * * * * *

(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) [of this section] * * *.

**6.** We attach no special significance to the Board's acceptance of the ALJ's findings of fact but rejection of his conclusions of law. *See, e. g., Crown Cent. Petroleum Corp. v. NLRB*, 430 F.2d 724, 730 n. 23 (5th Cir. 1970); *International Union of Elec. Workers v. NLRB*, 273 F.2d 243, 247 (3d Cir. 1959).

**7.** Chairman Fanning and Members Jenkins and Truesdale were in the majority; Member Penello dissented.

late section 8(a)(3). 29 U.S.C. § 158(b)(2) (1976). It is well settled that "membership" as used in section 8(a)(3) refers not only to the employee's basic decisions as to whether to join or remain in a union, but also to his decisions as to the level of his participation in the union and in union activities. *See Radio Officers' Union v. NLRB*, 347 U.S. 17, 39–42, 74 S.Ct. 323, 335–37, 98 L.Ed. 455, 476–78 (1954). Thus, actions encouraging or discouraging service as a union steward clearly fall within the scope of section 8(a)(3). *NLRB v. Milk Drivers & Dairy Employees, Local 338*, 531 F.2d 1162, 1165 (2d Cir. 1976), *enforcing Dairylea Cooperative, Inc.*, 219 N.L.R.B. 656 (1975).

Employers or unions may, however, justify discrimination in the terms or conditions of employment by demonstrating a substantial and legitimate business purpose for it. *NLRB v. Great Dane Trailers*, 388 U.S. 26, 33–34, 87 S.Ct. 1792, 1797–98, 18 L.Ed.2d 1027, 1034–35 (1967). *Teamsters Local 20 v. NLRB, supra*, 610 F.2d at 993.

■ A union's purpose in placing a steward on a job is presumptively legitimate,[8] for stewards play an important role in the administration of a collective bargaining agreement. *See Aeronautical Industrial District Lodge 727 v. Campbell*, 337 U.S. 521, 528 & n. 5, 69 S.Ct. 1287, 1290 & n. 5, 93 L.Ed. 1513 (1949) (approving practice of retaining union chairmen beyond the routine requirements of seniority). Whether the union's purpose is also substantial depends on the nature of the situation. In *Dairylea Cooperative, Inc., supra*, for example, the Board held in effect that a union's purpose in securing employment preferences for stewards is substantial in some situations and presumptively insubstantial in others.

The Board in *Dairylea* considered, en banc, the legality of a clause in a collective

bargaining agreement providing that the union's shop steward be deemed the most senior employee in the plant. The Board held that this "superseniority" clause was presumptively lawful to the extent its application was limited to the order of layoff and recall. The Board explained that

[t]he lawfulness of such restricted superseniority is * * * based on the ground that it furthers the effective administration of bargaining agreements on the plant level by encouraging the continued presence of the steward on the job. It thereby not only serves a legitimate statutory purpose but also redounds in its effects to the benefit of all unit employees.

219 N.L.R.B. at 658. But to the extent that the superseniority clause governed job benefits beyond the order of layoff and recall,[9] it was presumptively unlawful because it encouraged union activism while not necessarily serving any substantial union need. *Id.* Such a need might exist in a given case, but in that case the union must demonstrate the particular circumstances calling for steward superseniority. *Id.*

The Board distinguished *Aeronautical Industrial District Lodge 727 v. Campbell, supra*, on the basis that "*Campbell* sanctioned a certain privilege granted stewards because [conferring the privilege] was necessary for the proper carrying out of their responsibilities as stewards * * *." 219 N.L.R.B. at 659. In *Dairylea*, by contrast, the privilege granted stewards (superseniority *beyond* layoff or recall) was *not* necessary to their function as stewards. Privileges beyond superseniority for layoff or recall were not germane to the presumptively substantial need for a steward's continuing presence; and if the union needed extra privileges to attract qualified stewards, it could use alternative inducements, such as monetary compensation, which would have a less adverse impact on em-

---

**8.** This presumption of legitimate purpose can be rebutted by a showing of improper motivation. *NLRB v. Great Dane Trailers*, 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967).

**9.** In the plant in question, seniority determined not only the order of layoff and recall but also the assignment of jobs, vacation time, work shifts, and days off. *NLRB v. Milk Drivers & Dairy Employees, Local 338*, 531 F.2d 1162, 1164 (2d Cir. 1976).

ployees' section 8 right to be free of undue union influence. *Id. Accord, NLRB v. Milk Drivers & Dairy Employees, Local 338, supra,* 531 F.2d at 1166–67.

In ruling the union guilty of an unfair labor practice, the ALJ relied primarily on *Dairylea* and two other Board cases involving employment preferences for stewards: *Ashley, Hickham-Uhr Co.,* 210 N.L.R.B. 32 (1974), and *Local Union 798, Brotherhood of Painters & Allied Trades,* 212 N.L.R.B. 615 (1975), *enforced sub nom. NLRB v. Local Union 798,* 538 F.2d 312 (2d Cir. 1976). In *Ashley,* the union had the contractual power to select and change stewards on the job. The union exercised this power to place a steward on a job even though the union knew another employee would have to be laid off as a result. The parties stipulated, however, that the union wanted the steward it selected at the jobsite because it anticipated problems involving jurisdictional claims, and the man in question had experience at jobs where similar claims had been made and had experience in handling such problems. 210 N.L.R.B. at 32. The Board concluded no unfair labor practice had occurred: the union had a "legitimate and valid concern for placing an experienced steward on a potentially troublesome jobsite." *Id.* at 33. Stated in terms of the Supreme Court's holding in *NLRB v. Great Dane Trailers, supra,* the union's concern was both legitimate and substantial.[10]

In *Local Union 798, Brotherhood of Painters & Allied Trades, supra,* the Board again followed an approach consistent with the principles the Supreme Court stated in *NLRB v. Great Dane Trailers, supra.* At issue in *Local Union 798* was the legality of a clause in a collective bargaining agreement that required the hiring of persons designated by the union to serve as stewards, it being understood that there would be new hires selected from outside the em-

ployer's work crews. The Board found the clause unlawful, reasoning that

> [w]hile [the union] has legitimate interests in appointing stewards and policing contracts, we do not here find legitimate justification for the insisted-upon union control over the hiring process. Any failure of stewards who were already employed to enforce the trade agreements could surely be controlled by appropriate union training or, if necessary, by internal union discipline of stewards who fail to perform responsibly. We see no compelling reason why [the union] required control over the hiring process in order to maintain proper employee representation.

212 N.L.R.B. at 617. The Board distinguished *Ashley* on the basis that the appointment of a steward in *Ashley* was necessary to advance the union's legitimate interests. In *Local Union 798,* by contrast, the union "ha[d] not sought to place a particularly knowledgeable steward on a troublesome jobsite or with a particularly difficult employer, but ha[d] sought blanket hiring preference on every job * * * [for union-designated] stewards." *Id.* at 617, n. 3. In other words, the union's concern in appointing stewards in *Ashley* and in *Local Union 798* was presumptively legitimate in both cases; the concern was also shown to be substantial in *Ashley,* whereas there was no showing of substantiality in *Local Union 798.*

■ In the present case, the Board departed from the principles laid down by the Supreme Court in *NLRB v. Great Dane Trailers, supra,* and followed by the Board in *Dairylea, Ashley,* and *Local Union 798.* The Board justifiably concluded the appointment-of-steward clause was facially valid, since the clause can be invoked in cases where the union's interest is both legitimate *and substantial.*[11] The Board's

---

10. The Board in *Ashley* did state "[t]he key issue is whether [the union's] action herein was arbitrary, invidious, irrelevant, and thus a mask for discriminatory motivation." 210 N.L.R.B. at 33. It is only logical, however, that the Board's focus of review would be on whether the union's actual motivation was truly legiti-

mate, since the stipulated facts already established the union's concern was substantial.

11. For example, the clause in question can and has been invoked to permit the Union to designate stewards from the Company's regular work force. This designation advances legitimate union interests while exerting little ad-

decision was without basis, however, in holding that the application of the clause was lawful when (1) it resulted in the layoff of a worker already on the job with a vested interest in completing it, and (2) and Union made no specific showing that its interest in invoking the clause was not only legitimate but also substantial.[12]

In arriving at its holding, the Board reversed *Local Union 798, Brotherhood of Painters & Allied Trades, supra,* and adopted the position that a union's insistence on an employment preference for stewards may be justified by the assertion of a legitimate union purpose, *without more.* It is apparently irrelevant, in the Board's view, that the Union's action resulted in the dismissal of an employee already on the job, and that the Union might have pursued alternative means that would have achieved its legitimate aims while minimizing adverse impacts on the employees' interest in being free of union influence.[13] On its face, at least, the Board's analysis is plainly at odds with the Supreme Court's decision in *NLRB v. Great Dane Trailers, supra,* in

failing to consider the substantiality of the union's asserted purpose.

It is contended on behalf of the Board, however, that its decision is actually a reasoned extension of the principles of *Dairylea Cooperative, Inc., supra,* to the construction industry in which the present case arose. Although no discussion of *Dairylea* appears in the Board's decision in the instant case, an analysis of *Dairylea's* reach does appear in the companion case of *Teamsters Local 959, State of Alaska,* [1978–79] NLRB Dec. (CCH) ¶ 15,467 (239 N.L.R.B. No. 193) (1979).[14] The analysis in *Teamsters Local 959* is that a steward preference clause in the construction industry, where jobs are necessarily temporary, is analogous to the steward superseniority for layoff or recall that was held to be presumptively valid in *Dairylea* :

> [W]e find the [steward preference] clause herein valid on its face since by assuring the presence of a qualified steward on the job it serves the same basic objective as a clause granting stewards superseniority for purposes of layoff and recall.

---

verse impact on the Company employees' section 8 interest in being free of union influence.

**12.** Removing the requirement that the union demonstrate a legitimate *and substantial* justification permits a union to replace a regular employee with one of its own appointees simply by asserting that it is acting pursuant to legitimate union interests, and thus makes an appointment-of-steward clause subject to the abuse of cronyism. This union prerogative is subject only to the General Counsel's ability to show that the union is acting with an improper motive, a showing that the present case indicates is not an easy one to make.

Agent Raftery announced before the job began that he was going to appoint a steward. When he discovered a three-man crew at work, he invoked the appointment-of-steward clause and insisted on appointing a steward from *outside* the regular work force even though regular employee Scheble had to be laid off to make room for him. The outside workers that Raftery selected to fill the steward's position included his brother, an in-law, and a college friend. The only reasons adduced for these appointments were (1) Raftery's observation that one painter on one day had violated union rules by wearing a blue rather than a white shirt and (2) the assumption, not verified and later contradicted, that none of the Company's

regular employees was qualified to serve as a steward. The assumption is unverified in that there was no evidence the Company had ever retaliated against an employee for enforcing union trade rules, and it is contradicted in that regular employee Scheble, laid off to make room for a "qualified" steward (Raftery's brother), was subsequently appointed by Raftery as the steward on another of the Company's jobs. The ALJ reasonably found the Union's asserted justifications were insufficient.

**13.** The Board stated:

> [A]s [the Union] acted here for a legitimate aim, its actions, *with their attendant results,* did not violate the Act * * *.
> * * * [T]he degree of extent of the union's problem should have no bearing on the lawfulness or unlawfulness of its conduct. *District Council No. 2 of the Brotherhood of Painters & Allied Trades,* [1978–79] NLRB Dec. (CCH) ¶ 15,457 at 28,888 (239 N.L.R.B. No. 192) (1979) (emphasis added) (quoting *Local Union 798, Brotherhood of Painters & Allied Trades,* 212 N.L.R.B. 614, 618 (1974) (dissenting opinion)).

**14.** The Board did not cite either *Dairylea* or *Teamsters Local 959* in its opinion in the instant case.

[1978–79] NLRB Dec. (CCH) ¶ 15,467 at 28,-916.

Even this reasoning, however, logically justifies only a clause that empowers the union to appoint stewards from among qualified union members who are also members of the employer's regular work force. When the union goes further, and selects stewards from outside the employer's work force, it exercises a more visible effect on employee job rights. If a union purpose is to be not only legitimate *but substantial*, as *NLRB v. Great Dane Trailers, supra*, requires, there must be some showing on the union's part that selecting stewards from the workers the employer already has on the job is not sufficient. The Board's opinions ignore this requirement.

The dissenting opinion of Judge McMillian fills this important gap in the Board's reasoning. His dissent hypothesizes that

the temporary nature of employment characteristic of the construction industry increases employee dependence upon the good will of the employer and make steward independence, which is critical to effective administration of the collective bargaining agreement, more difficult to achieve.

*Infra* at 1337. The dissent reasons that the Board must have taken "these circumstances" into account when it chose to overrule *Local Union 798* and that the Board's new position results from a " 'reweigh[ing]' [of] the balance between the Union's 'legitimate interests in appointing stewards and policing contracts' and the consequent invasion of employee rights." *Infra* at 1338. This weighing, clearly, is a matter within the Board's specialized knowledge of industrial relations and ordinarily should command great deference.

The Board's opinions, however, do not indicate it has performed this weighing; that is, the Board has not exercised its expertise on the question whether construction employees are so dependent upon the good will of their employers that a union has a substantial as well as a legitimate purpose in seeking to require the employer to hire whomever the union designates as a steward on a job.[15] The Board instead has relied on the rationale that union action in pursuit of a legitimate objective is lawful despite an adverse *and unnecessary* effect on the rights of regular employees. As the Board put it, " 'the degree of extent of the union's problem' should have no bearing on the lawfulness or unlawfulness of its conduct." *Brotherhood of Painters, supra*, [1978–79] NLRB Dec. (CCH) ¶ 15,457 at 28,-888 (quoting *Local Union 798, Brotherhood of Painters & Allied Trades, supra*, 212 N.L.R.B. at 618 (dissenting opinion)). The Board's opinion pointed to no "significant developments in industrial life believed by the Board to have warranted a reappraisal of the question." *NLRB v. Weingarten, Inc.*, 420 U.S. 251, 265, 95 S.Ct. 959, 967, 43 L.Ed.2d 671 (1975). Nor did the Board point to any significant change in the decisional law since its order in *Local Union 798, Brotherhood of Painters & Allied Trades, supra*, was enforced by the Second Circuit, see 538 F.2d 312 (2d Cir. 1976). Indeed, the Board in the instant case simply endorsed the dissenting opinion in *Local Union 798*.[16] A Board decision coming to us

---

15. The Board in the instant case did state that the Union's purpose was "legitimate" because

its sole reason for exercising its contractual power to designate its own steward was to ensure it would have present a steward who would be more disposed to enforce trade rules and police the contract without fear of losing a regular job.

[1978–79] NLRB Dec. (CCH) ¶ 15,457 at 28,888. This statement is not tantamount to a finding by the Board that regular construction employees tend *in fact* to be less disposed to enforce trade rules and police the contract. The statement is instead simply a finding that the Union

articulated a legitimate rather than an arbitrary justification. The Board did not go further and require the Union to show "that a nexus exists between its asserted justification and the factual situation confronting it when it caused an employee's layoff by application of a stewards clause." *Id.* at 28,890 (dissenting opinion of Member Penello).

16. *Local Union 798* was decided by a 3–2 vote, with Members Miller, Kennedy and Penello in the majority and Fanning and Jenkins dissenting. The instant case was decided by a 3–1 vote. Fanning and Jenkins were joined by Member Truesdale, who was appointed to the

in such a context does not merit "any great amount of deference," *Local 777, Democratic Union Organizing Committee, Seafarers International Union v. NLRB*, 603 F.2d 862, 872 (D.C.Cir.1978), and we cannot affirm it on the basis of a post hoc rationalization, especially one not supported by the Board's findings. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995; *Pacific Southwest Airlines v. NLRB*, 587 F.2d 1032, 1039 (9th Cir. 1978).

At the same time, however, we do not foreclose the possibility that the Board may yet present a rationale, within the *NLRB v. Great Dane Trailers* framework, for the lawfulness of a broad appointment-of-steward clause.[17] For example, we do not reach the question whether the Board could decide, as it did in *Dairylea Cooperative, Inc., supra*, with respect to superseniority for purposes of layoff or recall, that a union's purpose in placing a steward on a jobsite at the beginning of a project is presumptively substantial, with no showing therefore being required of the union. It remains, however, that the Board had no basis for its decision in the instant case that the Union could force the layoff of a regular employee without demonstrating a substantial reason for doing so.

We note that this conclusion might well obtain even if the Union could routinely select stewards from outside the regular work force at the beginning of a job. Placing a steward on the job at the beginning of the project merely prevents the employee's hire in the first place, whereas placing a steward at a later time, causing thereby another employee's removal from the job, is a more visible display of union power, and is therefore a stronger reason to infer an impermissible encouragement of union activism.[18]

In any event, the union in this case had the burden of demonstrating the substantiality of its purpose, and the ALJ, whose findings the Board adopted,[19] found the Union had not shown there was "any problem which required the presence of an experienced steward" selected from union members not among the employees then working. *District Council No. 2 of the Brotherhood of Painters & Allied Trades, supra*, slip op. at 9 n. 18, 9–10. This finding is supported by substantial evidence on the record as a whole.

It is true that the Union here can complain that it was the Company's failure to notify agent Raftery of the job's commencement that made any steward appointment come after the beginning of the job. Nevertheless, the ALJ reasonably found that the Company's failure to notify, even coupled with one painter's violation of a white uniform rule, did not give the Union substantial justification for doing what it did. The agreement was informal, *see* note 3 *supra* ; the failure to notify was apparently not willful; there was no history of anti-union animus on the part of the Company; and the trade union violation was *de minimis*. The Union was at most justified in appointing a steward from among the experienced workers already on the job. The Union might also seek to put in place a more reliable mechanism for learning when new jobs are about to begin.

■ On the basis of the foregoing, we direct the Board to vacate its order dismiss-

---

Board since *Local Union 798* was decided. Member Penello dissented.

**17.** By a "broad" appointment-of-steward clause we mean one which authorizes the union to select stewards from outside the regular work force.

**18.** The presumptive effect of a union's causing an employee to be discharged is the encouragement of union membership. This is so because such action dramatically demonstrates the union's power over the employee and its ability to affect his livelihood. Given the presumptive result, the union violates Section 8(b)(2) and (1)(A) unless the disruption of employment was pursuant to the enforcement of a valid union-security contract provision or was necessary to the performance of the union's representative functions. *Bricklayers Local No. 7*, 224 N.L.R.B. 206, 206 (1976) (citations omitted).

**19.** The difference between the Board and the ALJ was over the legal issue whether the Union's conduct was presumptively unlawful, as the ALJ held, or presumptively lawful, as the Board held.

ing the complaint and enter the affirmative order recommended by the ALJ, including the provision that Steven Scheble be made whole for any loss of earnings he may have suffered because the Union unlawfully caused his employer to lay him off. We further direct the Board to adopt the ALJ's cease and desist order, modified so as to apply only to situations where appointment of a steward would displace a worker who is already on the job.

McMILLIAN, Circuit Judge, dissenting.

I agree with the majority that the appointment-of-steward clause is facially valid. In view of the important role stewards play in the collective bargaining process, *e. g., Aeronautical Industrial Lodge 727 v. Campbell,* 337 U.S. 521, 528–29, 69 S.Ct. 1287, 1290–91, 93 L.Ed. 1513 (1949), I would be reluctant to conclude that a collective bargaining agreement provision which grants a limited preference to stewards and thereby furthers employee organizational rights is absolutely barred by the neutrality policy of § 8. An accommodation is permissible under § 8 when a proper justification for such a collective bargaining provision is shown. *See D'Amico v. NLRB,* 582 F.2d 820, 825 (3d Cir. 1978), *citing NLRB v. Great Dane Trailers, Inc.,* 388 U.S. 26, 33–34, 87 S.Ct. 1792, 1797–1798, 18 L.Ed.2d 1027 (1967); *Dairylea Cooperative, Inc.,* 219 N.L.R.B. 656, 658 (1975), *enforced sub nom. NLRB v. Milk Drivers & Dairy Employees Local 338 (Dairylea),* 531 F.2d 1162 (2d Cir. 1976).

However, I do not agree with the majority that the Union failed to establish the requisite legitimate and substantial justification for its action. Therefore, I respectfully dissent.

Section 8 of the National Labor Relations Act was designed to allow employees to fully exercise their § 7 organizational rights without jeopardizing their employment status. Discriminatory conduct by either an employer or union which induces employees to join unions, to be good, bad or indifferent union members, or not to join unions is proscribed by the neutrality policy mandated by § 8. *See Radio Officers' Union v.*

*NLRB,* 347 U.S. 17, 40, 74 S.Ct. 323, 331, 98 L.Ed. 455 (1954). The finding of an unfair labor practice ordinarily depends upon whether the discriminatory conduct was motivated by an improper purpose. *NLRB v. Great Dane Trailers, Inc., supra,* 388 U.S. at 33, 87 S.Ct. at 1797. "Intention becomes the touchstone; in determining whether the section [8(b)(2)] has been violated, the 'true purpose' or 'real motive' behind the actions of the unions should be ascertained." *Lummus Company v. NLRB,* 119 U.S.App.D.C. 229, 339 F.2d 728, 734 (1964) (footnote omitted); *Fruin-Colnon Corp. v. NLRB,* 571 F.2d 1017, 1023 (8th Cir. 1978). "Some conduct . . . is so 'inherently destructive of employee interests' that it may be deemed proscribed without need for proof of an underlying improper motive." *Id., citing NLRB v. Brown,* 380 U.S. 278, 287, 85 S.Ct. 980, 985, 13 L.Ed.2d 839 (1965), *and American Ship Building Co. v. NLRB,* 380 U.S. 300, 311, 85 S.Ct. 955, 963, 13 L.Ed.2d 855 (1965). But, in the absence of proof of improper motivation, *see NLRB v. Erie Resistor Corp.,* 373 U.S. 221, 227, 83 S.Ct. 1139, 1144, 10 L.Ed.2d 308 (1963), discriminatory conduct which has a "comparatively slight" adverse effect on employee rights may be justified by demonstrating a "legitimate and substantial business [or union] purpose." *NLRB v. Great Dane Trailers, Inc., supra,* 388 U.S. at 33–34, 87 S.Ct. at 1797. Upon such a showing, the Union's conduct is prima facie lawful and in order to find an unfair labor practice an affirmative showing of improper motivation on the part of the Union must be made by the Company. *Id.* at 34, 87 S.Ct. at 1798.

In the present case it is undisputed that the Union's conduct was discriminatory and encouraged union membership. By demanding that the Company hire the steward appointed by the Union and thereby causing the Company to lay off another employee, the Union discriminated against those employees who, in the exercise of their § 7 organizational rights, chose not to be active union members. Further, the Union's conduct in the present case clearly encouraged employees to be "active" union

members.[1] It is unrealistic to think that the Union would appoint unenthusiastic union members to serve as stewards. *See NLRB v. Milk Drivers & Dairy Employees Local 338 (Dairylea)*, 531 F.2d 1162, 1165–66 (2d Cir. 1976), *enforcing Dairylea Cooperative, Inc.*, 219 N.L.R.B. 656 (1975). Thus, the Union's demand that the Company hire its appointed steward caused the discharge of an employee and is presumptively unlawful. Unless justified by the Union, its conduct clearly constituted an unfair labor practice in violation of § 8(b)(2). *E. g., International Union of Operating Engineers Local 18 (Ohio Contractors' Ass'n)*, 204 N.L.R.B. 681 (1975). The issue before the Board was justification.

Unlike the majority, I would accept the Board's determination that the Union's asserted justification was sufficient.

The Union asserted that the appointment of a steward from outside the Company's regular work force was an attempt to ensure that the collective bargaining agreement would be "policed" by a qualified steward, that is, a steward more independent of the employer and thus less likely to be intimidated by the prospect of losing his job if he enforced the collective bargaining agreement. The Union thus justified its conduct as in furtherance of the effective administration of the collective bargaining agreement, a legitimate union objective which benefited all the employees.

The Board accepted the Union's justification,[2] concluding that because "[the Union] acted here for a legitimate aim, its actions, *with their attendant results*, did not violate the Act. . . ." Slip op. at 4 (emphasis added), *citing Ashley, Hickham-Uhr Co.*, 210 N.L.R.B. 32, 33 (1974) (hereinafter *Ashley, Hickham*). The Board, in effect, agreed that such discrimination was, as in *Dairylea*, an "incidental side effect of a more general benefit accorded all employees," even though the Union's conduct in demanding that the Company hire an appointed steward caused the layoff of another employee.[3] *Dairylea Cooperative, Inc., supra*, 219 N.L.R.B. at 658.

I agree that the discharge of an employee caused by the Union raises a presumption of encouragement of union membership. "Not every encouragement of union membership is unlawful . . . ." *Ashley, Hickham, supra*, 210 N.L.R.B. at 33. In fact, an effective union will in itself encourage union membership. *See Local 357, Teamsters v. NLRB*, 365 U.S. 667, 675–76, 81 S.Ct. 835, 839–40, 6 L.Ed.2d 11 (1961). "[U]nder §§ 8(a)(3) and 8(b)(2), encouragement of membership is a *sine qua non* of a violation, but does not, without more, establish a violation." *NLRB v. Milk Drivers & Dairy Employees Local 338 (Dairylea), supra*, 531 F.2d at 1166. Thus, in the absence of improper motivation, the union may still prevail if it can establish legitimate and substantial justifications, even though its action is discriminatory and encourages union membership. *See id., citing NLRB v. Great Dane Trailers, Inc., supra*, 388 U.S. at 34, 87 S.Ct. at 1798.

---

1. Member Penello argues in his dissenting opinions in the present case and two similar cases decided the same day, *United Bhd. of Carpenters Local 49 (Scott & Duncan, Inc.)*, 239 N.L.R.B. No. 191 (1979), and *Teamsters Local 959 (Ocean Technology, Inc.)*, 239 N.L.R.B. No. 193 (1979), that because union interference with employment raises a presumption of encouragement of union membership, well-settled precedent requires that the union show that its action was "*necessary* to the effective performance of the union's representative functions" in order to rebut the presumption. 239 N.L.R.B. No. 192 (slip op. at 8) (emphasis added); *see, e. g., NLRB v. Bricklayers Local No. 7*, 563 F.2d 977 (9th Cir. 1977) (per curiam), *enforcing* 224 N.L.R.B. 206 (1976); *International Union of Operating Eng'rs Local 18 (Ohio Contractors' Ass'n)*, 204 N.L.R.B. 681 (1975). Member Penello argues that the Union's causing the layoff of employee Scheble can be regarded as lawful only if the Union can rebut the adverse presumption created thereby by affirmatively showing that its action was necessary to the effective performance of its representative functions. For example, the Company argues that the Board should have required the Union to show that employees already hired consistently or continuously refused to enforce the union trade rules, union jurisdiction or the collective bargaining agreement before approving the Union's appointment of an outside steward.

2. The "significance" to the Board of the Union's asserted justification was no doubt implicit in the fact that it involved stewards and their important role as employee representatives. *E. g., Aeronautical Ind. Lodge 727 v. Campbell, supra*, 337 U.S. at 528–29, 69 S.Ct. at 1290–91.

3. The employee laid off was himself a union member. However, it is well established that the prohibition against discrimination to encourage or discourage union membership in

The Board balanced the Union's conduct, which was discriminatory and encouraged union membership, against the important and legitimate union interest in the presence of qualified stewards on the job, which benefits all employees. This was the basic compromise established in *Dairylea*, in which the Board recognized that steward superseniority limited to layoff and recall is presumptively valid even though it ties special benefits to union status, but that steward superseniority clauses which go beyond layoff and recall are presumptively unlawful and must be justified by the party asserting their legality. *Dairylea Cooperative, Inc., supra*, 219 N.L.R.B. at 658; *see, e. g., Teamsters Local 20 v. NLRB*, 610 F.2d 991 (D.C.Cir.1979) (per curiam); *NLRB v. Local 443, Teamsters*, 600 F.2d 411 (2d Cir. 1979); *D'Amico v. NLRB, supra*, 582 F.2d 820; *NLRB v. Auto Warehousers, Inc.*, 571 F.2d 860 (5th Cir. 1978); *A.P.A. Transport Corp.*, 239 N.L.R.B. No. 165 (1979); *Pattern Makers' Ass'n (Michigan Pattern Manufacturers' Ass'n )*, 233 N.L.R.B. 430 (1977); *Union Carbide Corp., Chemical & Plastics Operations Div. (Local 8-891, Oil, Chemical & Atomic Workers )*, 228 N.L.R.B. 1152 (1977).

Here the Board decided that the challenged appointment-of-steward clause was sufficiently analogous to the limited steward superseniority clause approved in *Dairylea* and thus was presumptively valid. The Board evidently was persuaded that the appointment of a steward by the Union in the construction industry was the functional equivalent of steward superseniority limited to layoff and recall. This functional similarity was expressly recognized in the two companion cases, *United Brotherhood of Carpenters Local 49, supra*, 239 N.L.R.B. No. 191 (slip op. at 5), and *Teamsters Local 959, supra*, 239 N.L.R.B. No. 193 (slip op. at 7–8). As the Board observed in *Teamsters Local 959*, "[b]ecause workers in hiring hall situations are usually employed only for the duration of particular jobs rather than on a

permanent basis, the concept of 'layoff and recall' has little relevance." Slip op. at 7–8. The present case does not involve an exclusive hiring hall; normal construction work, however, is periodic and employment is not continuous. The individuals employed on a particular job are constantly fluctuating even though an employer may employ a certain group of employees fairly steadily. Thus, limited steward superseniority is ineffective as a means to ensure the continued presence of a steward on the job as an employee representative. Further, the temporary nature of employment characteristic of the construction industry increases employee dependence upon the good will of the employer and makes steward independence, which is critical to effective administration of the collective bargaining agreement, more difficult to achieve.

The Board determined that, under these circumstances, the appointment of a steward by the Union, even from outside the employer's work force, would accomplish in the construction industry what steward superseniority limited to layoff and recall did in *Dairylea*: the protection of employee organizational rights by ensuring the continued presence of a steward on the job. The Board has weighed the fact that some job-related benefits necessarily accrue to stewards by their appointment as stewards against the advantages thereby secured to all employees and upheld the appointment-of-stewards clause.

I would defer to the Board even though, as noted by the majority, its reversal of position on this issue is substantially unexplained. Maj. op. at 1333 & note 16. Here, the background is not as clouded by "ad hoc and inconsistent judgments" as was the case in *Local 777, Democratic Union Organizing Committee, Seafarers International Union v. NLRB*, 603 F.2d 862 (D.C.Cir. 1979). Moreover, here the Board has specifically, if somewhat cryptically, overruled its

---

§ 8(a)(3) includes reference to the degree of a union member's participation in union activities as well as the initial decision whether or not to join the union. *See Radio Officers' Union v. NLRB*, 347 U.S. 17, 39–42, 74 S.Ct. 323, 335–336, 98 L.Ed. 455 (1954); *Dairylea Coop. Inc., supra*, 219 N.L.R.B. at 658 (employment benefits which encouraged employees to serve as stewards).

prior decision in *Local 798, Brotherhood of Painters & Allied Trades*, 212 N.L.R.B. 615 (1974), *enforced without published opinion*, 538 F.2d 312 (2d Cir. 1976), 239 N.L.R.B. No. 192 (slip op. at 5 n.9).[4]

In *Local 798* the Board found no legitimate justification for an appointment-of-steward clause, despite recognition that the union had "legitimate interests in appointing stewards and policing contracts." 212 N.L.R.B. at 617. Here, the Board has evidently "reweighed" the balance between the Union's "legitimate interests in appointing stewards and policing contracts" and the consequent invasion of employee rights. In doing so, the Board overruled its holding in *Local 798* but reaffirmed its holding in *Ashley, Hickham*, with one significant change. Such a determination is clearly a matter within the special expertise of the Board. *E. g., NLRB v. Miranda Fuel Co.*, 326 F.2d 172, 184 (2d Cir. 1963) (Friendly, J., dissenting). "It is the primary responsibility of the Board and not the courts 'to strike the proper balance between the asserted [union] justifications and the invasion of employee rights in light of the Act and its policy.'" *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378, 88 S.Ct. 543, 546, 19 L.Ed.2d 614 (1967), *citing NLRB v. Great Dane Trailers, Inc., supra*, 388 U.S. at 33–34, 87 S.Ct. 1792, 1797–1798, 18 L.Ed.2d 1027.

In *Ashley, Hickham*, the union sought to place an experienced steward from the union hall on a jobsite of the employer, a company engaged in the design, construction and repair of heavy equipment, even though it was aware that the appointment of a steward would cause the employer to lay off another employee. The parties stipulated that the union's asserted reason for appointing the particular steward was the individual's experience as a steward on a jobsite where the union had jurisdictional disputes with other unions, that the union expected similar jurisdictional disputes at this jobsite, and that the individual appointed would effectively enforce the union's jurisdictional claims and its collective bargaining agreement. 210 N.L.R.B. at 32. The Board recognized that the union had "a legitimate and valid concern for placing an experienced steward on a potentially troublesome jobsite." *Id.* at 33. Because the parties had in effect stipulated that the union's action was in furtherance of this legitimate union objective and thus prima facie lawful, the Board identified the key issue as whether the union's action was arbitrary, invidious or irrelevant to legitimate union interests and thus a mask for discriminatory motivation. *Id., citing Chicago Federation of Musicians Local 10 (Shield Radio & T.V. Productions, Inc.)*, 153 N.L.R.B. 68, 83–84 (1965). The Board found the General Counsel had failed to establish that the union's action was im-

---

**4.** I also think that *Local 798* is distinguishable on its facts. The Board in *Local 798* stated that there was no compelling reason why the union should control the hiring process by appointing outside stewards in order to maintain proper employee representation. 212 N.L.R.B. at 617. The Board observed that "[a]ny failure of stewards who were already employed to enforce the trade agreements could surely be controlled by appropriate union training or, if necessary by internal union discipline of stewards who failed to perform responsibly." *Id.*

Although similarly involving the construction industry, *Local 798* is distinguishable in several ways from the present case, not the least of which is the interim decision in *Dairylea* expressly validating limited preferential treatment for stewards. The stewards clause in *Local 798* provided that the union had the right to designate a job steward on each job and further provided that all stewards were to be

designated "from the union hall from the ranks of the unemployed members." In addition, the union's by-laws provided that stewards must be union members in good standing for three years. The Board found that the stewards' clause was intended to permit the union to require the hiring of designated stewards and in that way obtain additional employment. 212 N.L.R.B. at 616.

In comparison, the appointment-of-steward clause in the present case did not restrict the appointment of stewards to unemployed union members, there are no eligibility requirements for appointment as steward, and, as found by the Board, the Union's "sole reason for exercising its contractual power to designate its own steward was to ensure it would have present a steward who would be more disposed to enforce trade rules and police the contract without fear of losing a regular job." Slip op. at 4.

properly motivated and concluded that the "union's conduct in demanding [the appointed individual's] hire as its steward has not been shown to constitute an unfair labor practice, notwithstanding that it may have foreseen that his hire would result in the displacement of another of its members. . . ." 210 N.L.R.B. at 33.

The difference I see between the Board's analysis in the present case and in *Ashley, Hickham* is a deemphasis upon the existence of special circumstances requiring the placement of a particularly knowledgeable or experienced steward on a troublesome jobsite or with a troublesome employer. *Local 798* proposed that the existence of these special circumstances was crucial to the validity of the union's appointment of a steward. 212 N.L.R.B. at 617 n.3. As stated in the dissenting opinion in *Local 798*, "the degree or extent of the union's problem [should have no] bearing on the lawfulness or unlawfulness of its conduct. Conduct which is engaged in solely for the purpose of promoting *legitimate* union objectives under the collective bargaining relationship cannot be classified as an arbitrary encouragement of union membership. . . ." 212 N.L.R.B. at 618 (emphasis in original).

The absence of special circumstances is not particularly critical in the present case, where the Union sought to appoint a steward in reaction to violations of union trade rules and the failure of those employees already on the job to either correct or report the violations. However, I note that in one of the companion cases, *United Brotherhood of Carpenters Local 49*, slip op. at 4–5, nothing prompted the union's appointment of a steward other than the union's legitimate desire to retain the same steward

on the jobsite. In the other companion case, *Teamsters Local 959*, slip op. at 5 n.4, some of the testimony before the ALJ referred to minor jurisdictional problems with the employer.

In sum, the Board's acceptance of the Union's asserted justification has validated the Union's conduct. The issue is now, as in *Ashley, Hickham*, whether the Union was improperly motivated. The affirmative burden of producing evidence of improper motivation is upon the Company (or the General Counsel). *See NLRB v. Great Dane Trailers, Inc., supra*, 388 U.S. at 34, 87 S.Ct. at 1798, *citing NLRB v. Brown, supra*, 380 U.S. at 289, 85 S.Ct. at 987 *and American Ship Building Co. v. NLRB, supra*, 380 U.S. at 311–13, 85 S.Ct. at 963–964. Here, the Board made no finding of improper motivation, even though there was some evidence of improper motivation.[5] However, "[t]he law is clear that when the record contains substantial evidence in support of each of two different conclusions, the choice of decisions is in the province of the Board." *Teamsters Local 20 v. NLRB, supra*, 610 F.2d at 995. I would accept the finding of the Board.

Furthermore, in my opinion, whether or not the Union's action is "necessary to the effective administration of the collective bargaining agreement," as discussed in Member Penello's dissent, would necessarily be part of the Board's inquiry into whether the Union's action is "arbitrary, invidious or irrelevant" to legitimate union objectives. For example, in *Building Material, Truck Drivers Local 282 (Explo, Inc.)*, 229 N.L.R.B. 347, 351 (1977), the Board held that the union's appointment of an outside steward for the purposes of granting the appointer's son-in-law a good job and retaliating

---

**5.** The Company argues that the real reason for the appointment of a steward in this case was nepotism. *See Building Material, Truck Drivers Local 282 (Explo, Inc.)*, 229 N.L.R.B. No. 11 (1977) (union business agent appointed his son-in-law as shop steward). The majority describes it as "cronyism." The Company emphasizes that the first steward appointed was the business agent's brother, the third was married to one of the business agent's nieces and the fourth attended college with the busi-

ness agent. The Union, intervenor in this case, notes that over 100 of its members are related in some manner to Gregory Raftery. Neither the ALJ nor the Board accepted the Company's argument on this point. The ALJ did find that the appointment-of-steward clause was unlawfully enforced because another employee was laid off as a result, not because the business agent was improperly appointing his relatives or friends as stewards.

against the other employees was "arbitrary, invidious and discriminatory." Similarly, if the Board had found here that business agent Raftery appointed an outside steward only to give his brother a job, I would readily agree that the Union had violated § 8(b)(2). Under those circumstances, the Union's action would have been irrelevant to legitimate union interests and the Union's asserted justification merely a mask for an improper motive. I recognize that there was some evidence to support a finding that the Union's motives were improper (the relationship of the outside stewards appointed to Raftery and the fact that employee Scheble was later designated as a steward on another Company job); however, no such finding was made by either the ALJ or the Board.

I would deny the petition for review.

