## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## QUICK FIND CO., Respondent.

### No. 82–1353.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 15, 1982.

Decided Jan. 24, 1983.

Thomas M. Hanna, Thomas G. Bearden, McMahon, Berger, Breckenridge, Hanna, Linihan & Cody, St. Louis, Mo., for respondent.

William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Peter M. Bernstein, Susan L. Dolin, Washington, D.C., for N.L.R.B.

Before BRIGHT and ARNOLD, Circuit Judges, and HUNTER,* Senior District Judge.

BRIGHT, Circuit Judge.

The National Labor Relations Board (NLRB) petitions this court for an order enforcing its January 13, 1982 order against Quick Find Company (Quick Find). The NLRB determined that Quick Find violated section 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (3) (1976) (the Act), during a unionization drive among the company's production employees in the fall of 1980. Quick Find's violations included, *inter alia,* laying off most of the employees two weeks after receiving notice of a petition for union recognition, unlawfully soliciting and promising to rectify employee grievances, coercively interrogating employees, and threatening loss of benefits and jobs through intimation and innuendo. At issue on this appeal is whether substantial evidence supports the NLRB's conclusions.[1] We affirm the Board's order with respect to the section 8(a)(3) and two of the section 8(a)(1) violations. As to two additional section 8(a)(1) violations, however, we find that substantial evidence does not support enforcement.

### I. Background.

Quick Find Company is a small business located in St. Louis, Missouri. Quick Find manufactures steel material chests to fit in pickup trucks and vans. Dwight Gold, the president and founder of the company, and Nathan Fogel, the general manager since the summer of 1980, comprise the company's management. At the time of the labor dispute underlying this lawsuit, Quick Find employed seven full-time production workers and one clerical worker, as well as Gold, Fogel, and some sales personnel.

---

* ELMO B. HUNTER, United States Senior District Judge for the Western District of Missouri, sitting by designation.

1. The company does not contend that the Board applied incorrect legal standards, but rather disputes the evidentiary foundation of the Board's factual findings. Applying the standard of review established in *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), this court must enforce the Board's order if its findings are supported by substantial evidence on the record as a whole.

In October of 1980,[2] the seven full-time production employees met with representatives of Teamsters Local Union 688 to discuss the possibility of unionizing. All seven signed authorization cards, and on October 22, the union filed a petition for recognition with the NLRB. Two weeks later, on November 6, Quick Find laid off all but two of the production employees. Thereafter, the management and certain employees engaged in several conversations that the employees claimed were unlawfully coercive. On November 13, the union filed an unfair labor practice charge, alleging that Quick Find had committed numerous violations of section 8(a)(1) and (3). The representation election took place on January 9, 1981. On February 5 and 6, 1981, an administrative law judge heard both the unfair labor practice charge and the company's challenges to certain ballots cast in the representation election. The administrative law judge, whose opinion the NLRB adopted, held that Quick Find committed several violations of section 8(a)(1) and (3) of the Act. Quick Find opposes the Board's petition for enforcement of its order and challenges the Board's findings.

## II. *Section 8(a)(3) Violation—the November 6 Layoff.*

Quick Find laid off five of its seven production employees on November 6 and later recalled them to the active work force beginning December 26.[3] During the intervening weeks, the two remaining employees, Eugene Emily and Milton Kernebeck, constructed safety guards around the punch presses and continued production at a reduced level. Quick Find asserts that the layoffs were necessary because of excessive inventory, a downturn in sales, and a deliberate production slowdown by the employees. The NLRB considered and rejected this alleged business justification, however, finding instead that the layoffs were caused by anti-union animus.[4]

The dispute over the reason for the November layoffs focused primarily on the size of Quick Find's inventory, and on whether the size of the inventory would have triggered the layoffs absent a unionization threat. Quick Find's records show that as of November 6, there were 125 finished units in stock. Both Fogel and Gold testified that at that level, the inventory was too large and consumed all available storage space. Fogel estimated the ideal carrying level for inventory to be 50–60 units, while Gold claimed to be happiest with an inventory of zero. The inventory records, which extend back only through July 1980, show a wide variance in inventory levels, from a low of 44 units on July 16 to a high of 130 units on October 30. It appears that the company generally produced units at a fairly steady pace and then shipped them out as orders arrived. Thus, the fluctuation in inventory resulted primarily from the sporadic nature of incoming orders.

One of the principal reasons advanced by the Board in rejecting Quick Find's argument that it imposed the November layoff solely in response to an inventory buildup related to a comparison of the response by Quick Find to an earlier incident where inventories had built up and layoffs had occurred. In May 1980, the company had laid off all but one of its production employees, again purportedly due to lack of space for inventory. Although the company records only go back to July 1980, the

---

**2.** All subsequent dates will refer to 1980 unless otherwise noted.

**3.** Only four of the five employees returned after the layoff; the fifth declined the invitation to come back to work.

**4.** The administrative law judge's analysis, adopted by the NLRB, conforms to the *Wright Line* test, under which the Board's General Counsel must first show that protected activity was a motivating factor in the employer's decision. The burden then shifts to the employer to show he would have reached the same decision absent the protected activity. *See Wright Line, a Division of Wright Line, Inc.,* 251 N.L.R.B. 1083, 1089 (1980), *enforced,* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). This court approved the *Wright Line* test in *NLRB v. Fixtures Mfg. Corp.,* 669 F.2d 547, 550 (8th Cir. 1982).

employee responsible for keeping the daily inventory count testified that there were some 150 finished units on hand at the time of the May layoff. Despite the fact that the inventory buildup in May exceeded the November level by 25 units, Quick Find laid off the employees in May only partially, each continuing to work 1–4 days per week before being called back to work full-time as of June 19. In contrast, Quick Find completely laid off the employees in November for over a month and a half.

The NLRB determined that Quick Find's more severe response to less severe business conditions in November reflected a reason other than mere business necessity. The NLRB inferred anti-union animus from circumstances attendant to the November incident. The Board noted that the layoff action occurred within two weeks after Quick Find learned of the union's petition for recognition. Quick Find's timing of the layoff appeared especially suspicious because the inventory had equalled or exceeded 125 units on several days during the prior month; yet the company did not choose to impose a layoff until after the union drive had begun.[5]

Despite the fact that the inventory was lower in November than in May, Fogel maintained that "[i]t wouldn't have crossed my mind to lay [the employees] off at this time if there was room for storage." Fogel explained that business conditions required a full layoff rather than a rotational layoff because traditionally sales were slow in December. He testified that he believed production would suffer from a rotational system. In a similar vein, Gold also claimed that the overstock was more severe in November than in May and that prior to the layoff, the men had deliberately slowed down production to forestall a layoff. However, Quick Find did not introduce evidence to establish that these or similar circumstances did not also exist in May. Accordingly, the NLRB found that the company did not adequately distinguish the May and November layoffs.

Two additional factors contributed to the NLRB's finding of anti-union motivation for the November layoffs. First, the Board found that Quick Find attempted to use the layoffs to invalidate the votes of all the laid-off employees by invoking a company rule that employees absent from active work for more than three successive days would lose their employee status.[6] Second, Susan Emily, the company secretary, testified that shortly after the layoff, Gold instructed her to refrain from shipping any orders for several days.[7] The Board interpreted this as an attempt to pad the inventory in order to justify the layoffs.

Quick Find argues that the NLRB failed to consider adequately all of the evidence concerning the layoffs. The company points out that the two employees most responsible for bringing in the union were the two employees retained during the layoff. Quick Find also complains that the Board ignored the downturn in sales and the employees' work slowdown as factors contributing to the layoff decision.

After reviewing the record, we conclude that substantial evidence supports the Board's conclusion that the layoffs were unlawful. The Board's concentration on inventory size to the exclusion of the other elements of the company's business justification reflects the repeated testimony of Quick Find's own witnesses that inventory predominantly determined the layoffs. Moreover, Quick Find's witnesses could not adequately explain the suspicious timing of the layoffs nor the discrepancies between the May and November layoffs. When

5. Employee Kernebeck commented that he expected a layoff eventually because of the inventory buildup, but he was surprised that it happened before the inventory reached its May level. As a result, Kernebeck attributed the layoff to anti-union motivation.

6. This attempted disfranchisement did not succeed, but it could never have been proposed under a rotational layoff system, because the employees would have continued to go to work every two or three days.

7. Fogel and Gold denied taking such action, and the company records do not conclusively show whether inventory padding occurred or not.

pressed for an explanation, Gold professed to have forgotten many of the circumstances of the May layoff altogether. Quick Find's strongest argument is that it retained the two most vigorous union activists. Their retention, however, may be explained by the company's need to retain its two most knowledgeable and skillful production employees. Although the issue is close, we cannot say that the Board's determination lacks support from substantial evidence in the record. Accordingly, we grant enforcement on this issue.

## III. Section 8(a)(1) Violations.

### A. November 7.

■ The NLRB determined that on November 7, in a conversation among Milton Kernebeck, Eugene and Susan Emily, and Nathan Fogel, Fogel unlawfully discouraged unionization by soliciting grievances and promising to remedy them. The accounts rendered by the four participants are all substantially similar and fairly innocuous. The conversation began with the employees inquiring about the reasons for the layoff. Fogel gave excessive inventory as the cause, and then he asked about the employees' complaints. He remarked that he wished the employees had come to him instead of going to the union. According to both Kernebeck and Fogel, but not the Emilys, the conversation ended with Fogel indicating he would try to improve things in the future.

The Board found that Fogel intended to induce the employees to withdraw their support from the union by promising to address their grievances. Here, the Board's view overstates the incident. No evidence exists in the record tending to establish any coercion in fact from this conversation. Moreover, two employees did not recall Fogel making any statement concerning future improvements. Even in Kernebeck's version, Fogel did not tie the promise to improve conditions with a request that union support be dropped. We conclude that substantial evidence does not support the Board's finding of this section 8(a)(1) violation.

### B. November 12.

■ According to the Board's findings, on November 12 Gold spoke with Kernebeck, and in the course of the conversation unlawfully interrogated him about the union and threatened to revoke Kernebeck's benefits if he engaged in any union activities. Kernebeck's and Gold's versions of this conversation differ markedly. Kernebeck testified that Gold specifically asked him whether he planned to stick with the union. When Kernebeck replied that he did, Gold responded, "you're not going to better yourself, I guarantee it." Gold also allegedly remarked, "[y]ou know, you were booked for a raise," which the Board construed as implying that benefits might be withheld from Kernebeck because of his union activity. Gold denied making such coercive statements.

■ The Board credited Kernebeck and not Gold regarding this incident. Absent a showing of extraordinary circumstances, we defer to the Board's credibility determinations. See NLRB v. Oil Workers International Union, Local 6–578, 619 F.2d 708, 715 (8th Cir.1980). Accordingly, we enforce the Board's order regarding this section 8(a)(1) violation.

### C. November 14.

■ The Board found that Gold unlawfully interrogated, threatened, and solicited grievances from Susan Emily on November 14. Emily testified that on that date, Gold asked her whether the employees intended to go ahead with the union and told her they should have come to him with their problems instead of going to the union.[8] From Emily's account, she apparently perceived his comments as threats, because she testified that she remarked twice to Gold that her husband and the other employees needed the union's protection to avoid being fired.

---

8. Gold denied that Emily's version was accurate, but the NLRB credited Emily.

Regardless of Susan Emily's subjective perceptions, the objective content of Gold's alleged comments does not seem particularly threatening. Essentially, Gold inquired as to Emily's knowledge of the employees' support for the union and then commented that he would have preferred the employees to bring their problems to him. Because Emily was a secretary, and was not included in the bargaining unit, the Board found that Gold intended her to pass his message on to the production workers. Consequently, the Board held that Gold violated section 8(a)(1). However, Emily's account of the conversation in no way indicates such an intent. Given that Emily was not personally involved in the union movement and that Gold made no direct threats or promises to her, we conclude that substantial evidence does not support the Board's finding of a section 8(a)(1) violation in this instance.

### D. *December 22.*

On December 22, Gold and Fogel had a conversation with Kernebeck in which the Board found Gold and Fogel conducted an unlawful interrogation and gave Kernebeck an illegal bonus. According to Kernebeck, Gold and Fogel initiated the conversation by inquiring how he planned to vote in the election and who was responsible for starting the union drive. Kernebeck testified that he responded that he and Eugene Emily had initiated the movement and that his feelings about the union remained unchanged. Kernebeck stated that later that same day, when Kernebeck asked for his Christmas bonus, Gold told him no bonuses could be paid because of potential problems with the NLRB. Gold then gave him a $50 check and left, saying, "I still don't know how you're going to go."

Gold confirmed that he conversed with Kernebeck on December 22 and that Kernebeck's union sentiments came up for discussion, although in Gold's version Kernebeck raised the topic. Gold also admitted giving a bonus to Kernebeck, but claimed he was "badgered" into it.

This incident closely parallels the November 12 incident. As before, Gold corroborated substantial parts of Kernebeck's story while denying others. The administrative law judge again credited Kernebeck. In the December conversation, Gold continued his inquiry into Kernebeck's intentions with respect to the union. In light of the prior incident, Gold's interrogation should not be interpreted as idle curiosity. The bonus and Gold's parting words, "I still don't know how you're going to go[,]" further corroborate Gold's coercive intentions in that Kernebeck had clearly indicated how he intended to vote. The Board's finding of a section 8(a)(1) violation in the December 12 incident is supported by substantial evidence.

### IV. *Conclusion.*

In sum, we conclude that substantial evidence on the record as a whole supports the Board's finding that Quick Find violated section 8(a)(3) in the November 6 layoff and section 8(a)(1) in the November 12 and December 22 conversations with Kernebeck. Enforcement of the Board's order is hereby granted as to those violations. As to the November 7 and November 14 incidents, however, we find that substantial evidence does not support the Board's findings that Quick Find violated section 8(a)(1). Accordingly, we deny enforcement of those findings.