**BALLOU BRICK COMPANY,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 85–2420.

United States Court of Appeals,
Eighth Circuit.

Submitted May 13, 1986.

Decided Aug. 15, 1986.

Rehearing Denied Sept. 16, 1986.

Patrick J. Barrett, Omaha, Neb., for petitioner.

Mark S. McCarty, Washington, D.C., for respondent.

Before HEANEY, Circuit Judge, HENLEY, Senior Circuit Judge, and MAGILL, Circuit Judge.

HENLEY, Senior Circuit Judge.

This case involves an attempt by Lodge 1426 of the International Association of Machinists and Aerospace Workers (Union) to organize the workers at a plant owned by Ballou Brick Company. On May 2, 1983 the Union filed a petition for a representative election at Ballou Brick. Later, as a result of actions by the Company, the Union filed a complaint alleging unfair labor practices in violation of §§ 8(a)(1) and (3) of the National Labor Relations Act (Act), 29 U.S.C. §§ 158(a)(1) and (3).

The issues were consolidated and set before an Administrative Law Judge (ALJ) for purposes of hearing, ruling and decision. The ALJ found in an extensive opinion that Ballou had violated § 8(a)(1) of the Act by (1) requesting employees to engage in surveillance; (2) creating the impression of surveillance; (3) threatening employees and stating that employees had been discharged for union activities; (4) threatening plant closure; (5) encouraging employees to report union activities; and (6) maintaining a policy prohibiting solicitation and distribution of union literature. The ALJ further found that the Company had violated §§ 8(a)(1) and (3) of the Act by discharging thirteen employees to discourage membership in and support of the Union.

A panel of the National Labor Relations Board (NLRB or Board) affirmed the ALJ's decision. Ballou appeals arguing that the ALJ's findings are not supported by substantial evidence. The Board cross-appeals for enforcement of its order. We affirm the Board's decision as to the layoffs but reverse as to some of the unfair labor practices.

Passing for the moment those facts specifically relating to the incidences of al-

leged unfair labor practices, we now recount the basic underlying facts.

Ballou manufactures and sells bricks at its Sergeant Bluff, Iowa facility. As would be expected, its business is somewhat seasonal and related to the amount of construction being done. In April, 1983 it completed a major capital construction project at its plant.

Approximately fourteen employees met on April 23, 1983 at a union hall and all but one signed a card authorizing the Union to represent them. The following Monday, April 25, 1983, another meeting was held at a local tavern near the brickyard to have other employees sign authorization cards. That day the Union sent the Company a letter requesting that it be recognized as the collective bargaining agent of the Company's production and maintenance employees.

The company officials and supervisors met with a labor consultant and made a list of those employees they believed were potential union leaders and who would vote for a union. One of the supervisors admitted walking in on the meeting at the tavern. He was told not to discuss who was there with anyone.

On May 13, 1983 the Company advised fourteen employees that they were being laid off.[1] They were told the layoff was permanent and that it was not for misconduct, but rather for economic reasons. Each was given a letter restating this. The Company then held a meeting of the remaining employees who were told that the layoff was based on poor economic conditions and that they were lucky to be "survivors." The Company had prior layoffs in 1981 and 1982, but those were temporary.

An election was held on July 15, 1983. Of the forty-three votes cast, twenty were for the Union, ten were against and thirteen were challenged.

On July 27, 1983, after the election, the Company began recalling employees and eventually recalled seven of the employees who had been laid off. It also hired fourteen new employees.

I.

The petitioner first argues that substantial evidence on the record as a whole does not support the ALJ's finding that the thirteen employees were discharged in violation of §§ 8(a)(1) and (3). We note that an order by the NLRB in an unfair labor practice case is entitled to be enforced if the Board's findings of fact are supported by the record as a whole. *NLRB v. Vincent Brass & Aluminum Co.*, 731 F.2d 564, 566 (8th Cir.1984). Also, merely because two inconsistent conclusions may be drawn from the same evidence or that this court would be justified in deciding the case differently if acting *de novo* does not mean that the Board's order lacks the support of substantial evidence. *Id.*

Ballou contends that the Board failed to properly apply the *Wright Line* analysis to the layoff question. *See Wright Line, A Division of Wright Line, Inc.*, 251 NLRB 1083 (1980), *enf'd*, 662 F.2d 899 (1st Cir. 1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). According to this analysis:

> [W]hen employees are discharged for both legitimate and illegitimate reasons, the general counsel must make a *prima facie* showing that the employees' protected activity was a "motivating factor" in the employer's decision. The burden then shifts to the employer to show that the same action would have taken place even in the absence of the protected conduct.

*Vincent Brass & Aluminum Co.*, 731 F.2d at 566.

Ballou argues that a *prima facie* case of unlawful discharge was not proven in that there is not substantial evidence showing that the company officials who made the layoff decision had knowledge of individual employee's union activities or that protect-

---

**1.** Gary Brady, one of the laid off employees, was found to be a supervisor by the ALJ and there-fore not protected by the Act. This finding has not been challenged.

ed activity was the motivating factor in the decision to lay off the employees.

In an improper discharge case the employer's intent, since it is subjective, will rarely be proven by direct evidence, and the Board is free to draw reasonable inferences from both direct and circumstantial evidence. *NLRB v. Senftner Volkswagen Corp.*, 681 F.2d 557, 559 (8th Cir.1982). Inferences as to an employer's motivating intent "may be drawn from the employer's hostility toward the union, coincidence between the employee's activities and the discharge, or the absence of previous warnings or reprimands to the employee." *Lemon Drop Inn, Inc. v. NLRB*, 752 F.2d 323, 325 (8th Cir.1985) (citations omitted).

The ALJ's findings in this regard are not as complete as one might wish them to be; however, we believe the evidence is substantial enough to support a finding that the employer knew of the union activity and that this was the motivating factor behind the layoff.

The ALJ found that Ballou knew of the union activities of its employees before they were selected for layoff because of the Company's knowledge of the April 23 and 25 union organizing meetings. Also, the Company had received the Union's request to represent the employees. We also believe the Company had reasonable identification of the employees who attended the April 25 meeting. In this connection, we note the statement of supervisor William Heckart to employee Scott Clark that Heckart had driven by the tavern on the night of the meeting and knew who had attended the meeting by seeing whose vehicles were there.

We note also that other courts have found it is not necessary that the general counsel prove the employer's knowledge of a specific employee's opinion as to the union, when there is a mass layoff for the unlawful purpose of discouraging union membership. *See Birch Run Welding & Fabricating Inc. v. NLRB*, 761 F.2d 1175, 1179–80 (6th Cir.1985); *M.S.P. Industries, Inc. v. NLRB*, 568 F.2d 166, 176 (10th Cir. 1977).

We do not agree with the ALJ that the mere hiring of a labor consultant and conducting a vigorous campaign to present its position (except, of course, for those activities which are a violation of the Act) alone would show an unlawful antiunion animus. However, the Company's open hostility to the Union coupled with its other acts does support the ALJ's finding that this was the motivating factor behind the discharges. We note that at the Company's meeting with its labor consultant two of the laid off employees, Edward Thompson and David McCarthy, were listed as union leaders and that these two employees were among those not recalled after the election. At the Company's meeting, ten of the fourteen laid off employees were listed as potentially voting for the Union and three were listed as questionable. All of the laid off employees had signed union authorization cards, and attended at least one meeting. Moreover, the timing of this layoff right after the request for representation and the recall shortly after the election are suspect.

Also damaging to the Company's position is the statement attributed to its chief operating officer, John Hill, that the employees had been laid off because of union activity, and his comment to a former employee that he would be considered for employment after the union campaign died down. The ALJ found the testimony regarding these statements to be credible, and as there is nothing to make us think otherwise we accept them as true. *See NLRB v. Quick Find Co.*, 698 F.2d 355, 359 (8th Cir.1983).

While any one of these actions by the employer alone might not be sufficient to show that the protected activity was the motivating factor behind the layoff, we believe that taken as a whole and considered in light of the violation of § 8(a)(1) hereinafter detailed they provide substantial evidence to support the ALJ's finding that such was the case.

The Company further alleges that the layoff would have occurred regardless of any employee's involvement in protected activity because the decision was compelled

by economic necessity. It argues that the layoff was necessary because of a sharp decrease in sales, an accumulation of inventory with a lack of storage space, and the completion of the capital construction project.

Ballou contends that the ALJ ignored evidence that (1) it was predicting a downturn in business in its management meetings as early as January 6, 1983; (2) the layoff was conducted the same as in prior years; and (3) the employees hired in 1982 for the capital construction project were no longer needed.

The Company also asserts that there were individual reasons for dismissing each of the laid off employees.

Although we do not believe the Board makes a particularly eloquent case in rebutting the Company's argument, we do believe that there is substantial evidence to support the decision.

As to the inventory problem the ALJ found that (1) rather than the inventory of brick over-accumulating in May it had been steadily declining since March (from March to April there was an approximately 100,000 brick decrease, and from April to May there was a decrease of around 402,000);[2] (2) the yard contained at least one million more bricks at the time of the layoff in 1982; and (3) rather than decreasing the production of bricks after the layoff, the Company maintained or increased production levels.

The ALJ rejected the arguments as to a sharp decrease in sales by pointing out that shipments in May and July, 1983 were greater than in any of the previous four months, and in June and August, 1983 shipments were greater than in any month in 1982.

The ALJ surmised that because orders were generally delivered sixty to one hundred eighty days from the time they were placed the Company knew of these orders when it made the layoff in May, 1983. Although it was possible the Company did not know of all of these orders when it made the layoff, there is substantial evidence to support the ALJ's decision.

The ALJ also rejected the construction project argument by stating that only one of the laid off employees was specifically hired for the project, Edward Thompson, and he testified that when he was hired he was told he would work on the project but would then be a permanent maintenance electrician. As to the other unskilled employees hired between September and November, 1982, the ALJ found that they were mainly hired to work in the packaging department, and while they did at times help on the construction project it was company policy to move employees throughout the plant.

While it makes a certain amount of sense to conclude that after the completion of the construction project the Company would need fewer employees, there is substantial evidence to support the ALJ's findings.

The testimony of manufacturing operations supervisor Norman Mahoney in some respects is supportive of the ALJ's findings. He testified that of the nine people hired in the fall of 1982 and laid off in May, 1983, only Thompson was hired specifically for the project. When he listed the duties of the other employees, he stated that they were used primarily in packaging and to take the place of absent employees. We note, however, that Mahoney's testimony that more people were needed in the winter is in conflict with the testimony of supervisor William Heckart, who said that generally there was no need for extra employees in the winter, but rather they were needed in the spring, summer and fall which was the more active season. He testified that generally people were laid off in the winter as occurred in 1982. In fact, the shipment records support his testimony.

The ALJ also found that the layoff in 1983 did not follow the same procedure as those in 1982 and 1981. The ALJ concluded that the procedure was different be-

---

**2.** Shipping records reflect a steady increase in shipments beginning in March (an increase of 593,036 from February to March, 235,427 from March to April, and 278,204 from April to May).

cause the layoff list was neat whereas in previous years it was messy. Neatness is indeed a slender reed upon which to predicate a serious finding. However, neatness aside, there is substantial evidence showing the procedure was different.

Other, and perhaps minor, differences include the facts that letters explaining the layoff were handed out for the first time in 1983 and that the chief operating officer made the speech explaining the layoff in 1983 in contrast to 1982 when it was made by a plant superintendent. More significantly, in 1983 the employees were told the layoff was permanent and not temporary as before. This is significant because if this was a permanent layoff the employees would not be allowed to vote in the union election whereas they could vote if it was temporary.

In turning to the individual reasons for laying off the employees, we generally take notice that it is somewhat contradictory for the Company to have assured the laid off employees in the speech and letter that they were being laid off for economic reasons and not misconduct and now to argue as to some of the individuals that they were poor workers. As the ALJ found, there was no documentary evidence that any of the individuals were unsatisfactory workers; rather the only evidence of poor work was the testimony of company officials.

As to employee Robert Bean, the Company argues that he had limited experience and lacked proficiency. We find these reasons unpersuasive in light of Bean's recall after the election, which recall he rejected.

The Company argues that Brian Brady was laid off because he had been on workmen's compensation in May. While this may relate to issues applicable to the compliance stage, it does not affect our decision as to the propriety of the layoff.

Ballou states no reason as to why Scott Clark was laid off although it seems to imply in its brief that another employee was a better worker. We find this to be weak in light of Clark's recall on July 29, 1983.

Petitioner states that Robert Ingalls was a lackluster employee and yet it recalled him after the election.

David McCarthy, the Company complains, was not a skilled employee and had recently been demoted. We note, however, that he had been passed over for layoff in previous years. It is also pertinent that he was suspected of being a union leader. McCarthy has not been recalled although fourteen unskilled new employees have since been hired.

Bryan Palmer was laid off in 1982 but we note he was recalled. The Company makes the general allegation that he had refused to perform certain functions. The testimony of its former plant superintendent reveals, however, that Palmer did not refuse to perform the work (saw bricks), but rather had said he did not want to do it. The superintendent also testified that he did not consider this a serious problem at the time. We do not believe this incident was sufficient to justify Palmer's layoff. He has not been recalled.

John Palmer had been recently demoted. We note, however, that the Company thought enough of him to recall him in August, 1983.

Curtis Palmer, Ballou states, was a mediocre, unskilled performer. The fact that he had never been laid off previously coupled with the hiring of new unskilled workers makes his layoff questionable.

The Company does not complain about the work of Daniel Pojar (he had recently received a merit increase) and in fact he was recalled, but rejected the recall.

Kevin Ruring, the Company argues, was not proficient and yet he had been recalled after being laid off in 1981 and 1982. We question why he was recalled each of these times if he was a poor worker.

Kenneth Sopoci, Ballou states, was not proficient and merely an extra employee, but he was one of the first employees recalled in early August, 1983.

The Company gave no reason for the layoff of Ronald Warstler and we assume

he was a good worker because he was recalled in July, 1983.

The layoff of Edward Thompson presents more of a problem, and yet we believe it was improper. Thompson, along with James Osterholt, was specifically hired for the construction project. They both testified, however, that they were informed they would be kept on after the completion of the project as permanent maintenance electricians. Osterholt quit in December, 1982 to serve a prison sentence. When he asked for his job back in May, 1983, he was told he should wait for the union problems to die down. He was rehired in October, 1983.

Since the ALJ found these two men's testimony credible as to the permanency of their employment, we must accept it as true. *See Quick Find Co.*, 698 F.2d at 359.

We question why Thompson was not recalled as he had apparently been a good employee and it would seem reasonable that he would be recalled before a former employee who had quit was rehired.

We conclude that substantial evidence supports the ALJ's findings that the employees' protected activities were the motivating factor behind the layoff, that the Company's economic justifications were unsupported, and that Ballou has not sufficiently proven any valid reasons why the individual workers should have been laid off.

## II.

Ballou challenges the Board's findings of various independent § 8(a)(1) violations. In determining whether there has been a violation of this section it must be determined if the employer's conduct can be reasonably seen as interfering with, restraining or coercing employees in the exercise of their rights. *DeQueen General Hospital v. NLRB*, 744 F.2d 612, 614 (8th Cir.1984). Our standard on review is to affirm the Board's findings if they are supported by substantial evidence on the record as a whole. *Vincent Brass & Aluminum Co.*, 731 F.2d at 567.

*(1) Threatening Discharge and Requesting Surveillance.*

■ Ballou first contends that the ALJ was incorrect in finding that the plant superintendent's questioning of employee Scott Clark as to another employee's (Dale Watchorn) union activities, requesting any information about Watchorn's activities and commenting that "we'll take care of" Watchorn's activities, was a request for Clark to engage in surveillance and a threat to discipline employees for such activity.

Ballou argues that the charge or complaint never alleged that this discussion involved a threat of discharge and therefore it was unfair for the ALJ to find that the comment constituted such a violation because the Company did not have notice of the charge. The complaint alleges that this conversation involved a request to engage in surveillance and an interrogation of an employee but makes no mention that this constituted a threat to discharge or discipline an employee.

Assuming that there was fair notice of the claim of threat of discharge, the evidence is not substantial enough to support a finding of a violation of § 8(a)(1) from this one conversation for this specific violation. The ALJ's discussion was, to say the least, brief, and we simply do not believe the record supports a finding of threat of discipline or discharge. While questioning employees about union activities has been found in some circumstances to constitute a threat of punishment, *see NLRB v. Louisiana Manufacturing Co.*, 374 F.2d 696, 700 (8th Cir.1967), such is not to be found here from the isolated comment in question.

■ However, as to the finding of a request for an employee to engage in surveillance, we believe the evidence is substantially supportive. This is especially so when viewed in light of manager Mahoney's questioning of another employee, Lewis LeMaster, as to what he had heard about union activity and his request that

LeMaster "keep his ears open" and listen to find out what was said about the Union.

■ Relatedly, the Company argues that its rulebook did not encourage employees to report union activity as the ALJ found.

The Company's 1981 rulebook provided that:

If anyone should come to you and ask you to sign a Union authorization card, we are asking you now to refuse to sign it. You have the right to join and belong to a Union, and you have an equal right to not join and belong to a Union. If any other employees should interfere, try to coerce you into signing a Union authorization card, please report it to your supervisor and we will see that the harassment is stopped immediately.

On April 11, 1983 the rulebook was modified and this provision was changed to the following:

If anyone should ask you to sign a Union authorization card, we believe that you should refuse to sign. While you have the right to join a Union, you also have a right not to join.

These new rules were posted on bulletin boards in the Mill Room and packaging department.

The ALJ found the 1981 rule to be unlawful because it went beyond merely expressing the Company's opinion and had the effect of encouraging employees to report union activity and discouraging employees from engaging in protected activity. The ALJ further found that merely posting the rule change did not adequately inform the workers of it.

While the 1981 rule might have had a coercive effect when it was in effect, we disagree with the ALJ that the posting of the 1983 rule change was not effective. We have been shown no evidence that the employees did not know of the rule change or in fact were coerced by the former rule. We believe the posting of the changes was sufficient especially in light of the fact that the employees did not have personal copies of the rulebook from which they might be misinformed and the change was made two weeks before the start of the union campaign. We therefore conclude that the ALJ's conclusion concerning coercion by means of rulebook was not justified.

### (2) Creating an Impression of Surveillance.

■ The Company next challenges the ALJ's findings that it created an impression of surveillance.

The ALJ found from the conversation between Heckart and Clark that Heckart created the impression of surveillance of protected activity when the supervisor asked Clark if he had gone to the meeting at the tavern and to Clark's affirmative statement replied, "I thought so, me and Dave Clausen drove by to see who was all there by looking at the cars." Heckart then named some of the people who were present and asked Clark who else was there. Clark refused to name others. Heckart denied that he had made this statement but rather that he merely mentioned that he had noticed a lot of people were at the tavern that night.

The ALJ found Clark's statements to be the more credible and finding no reason to believe otherwise we accept them as such. *See Quick Find Co.*, 698 F.2d at 359. This testimony provided substantial evidence to support the ALJ's finding of the creation of an impression of surveillance.

### (3) Threatening Plant Closure.

■ Ballou challenges the ALJ's finding that it violated the Act when its supervisor Covington told a laid off employee, Thompson, that he had been informed by the chief operating officer that the employees had been laid off because of union activity, and that if the Union came in the plant would be closed and operations transferred to another facility. Covington denied that Hill had ever made these statements to him or that he had made these comments to Thompson.

The ALJ found that Thompson was the more convincing and credible witness and we accept this finding. *Id.* This consti-

tutes substantial evidence to support the ALJ's finding as a threatened plant closure is coercive and a violation of § 8(a)(1). *See Lemon Drop Inn, Inc.,* 752 F.2d at 324.

Ballou also argues that the comment cannot be considered a violation of the Act because Thompson was already laid off and could not be coerced in the exercise of his protected rights. However, as we have found that Thompson was illegally laid off, for present purposes he is considered an employee of Ballou because § 2(3) of the Act, 29 U.S.C. § 152(3), states that an "employee" includes "any individual whose work has ceased as a consequence of, or in connection with ... any unfair labor practice."

The Company also alleges that Covington was a relatively low ranking official and therefore his comments cannot necessarily be attributed to the employer.

The statements of a supervisor can be attributed as being those of the employer if the listening employee reasonably would be justified in believing that the supervisor was speaking for the employer. *NLRB v. Schroeder,* 726 F.2d 967, 971 (3d Cir.1984); *cf. NLRB v. Intertherm, Inc.* 596 F.2d 267, 272 (8th Cir.1979) (actions of a supervisor can constitute an unfair labor practice). We believe that the ALJ was correct in finding that these statements by Covington as an agent of Ballou could be attributed to the employer. We note that Covington stated that he had just spoken to Hill, a high ranking company official, and there was no evidence submitted to show why Thompson should have disbelieved Covington's statements. From this we conclude Thompson could have reasonably believed these statements represented company policy.

### (4) Soliciting Union Literature.

■ Last Ballou argues that the ALJ was incorrect in finding that it violated the Act by maintaining a policy of prohibiting solicitation and distribution of union literature.

On page four of its rulebook Ballou lists as one of the grounds for dismissal "Soliciting—Distributing Literature or Posting of notices on Company Property." However, on page six of the rulebook following a heading of "SOLICITATION AND LITERATURE DISTRIBUTION" the Company explains that "it must be understood that nothing will interfere with employees' protected concerted activities, regarding solicitation or distribution of literature during employees' non-work time."

The ALJ found that (1) these two sections created an ambiguity; (2) the employer in no way "flagged" the language on page four to warn the employees of the rule's limited effect; (3) the Company as the creator of the ambiguity bore the risk of its misinterpretation; and (4) the rule on page four was clear and straightforward while the rule on page six was "legalese." Therefore, the ALJ concluded that these rules constituted a violation of § 8(a)(1).

While we agree that in certain circumstances these two statements might amount to an unfair labor practice, in context we do not believe such is the case here. The amplification of the rule was merely two pages away from the original statement, not so far away that the two could not be connected. Moreover, characterization of the page six material as "legalese" does not impress us. We are not informed of any allegation or evidence that any employees actually believed they were prohibited from distributing union literature.

In any event, in present context we find that there is not substantial evidence to support the ALJ's finding of a prohibition of distributing union literature.

### III.

In conclusion, we enforce the Board's decision that the layoff was in violation of the Act and that Ballou committed an unfair labor practice in requesting employees to engage in surveillance, creating the impression of surveillance, and threatening plant closure. However, we reverse and refuse to enforce the decision to the extent it finds that (1) employees were threatened

with discipline or dismissal by the isolated comment of Ballou's supervisor Heckart; (2) the Company's rulebook encouraged employees to report union activities; and (3) Ballou's rulebook prohibited the distribution of union literature.