GSX CORPORATION OF
MISSOURI, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 89–2343.

United States Court of Appeals,
Eighth Circuit.

Submitted March 13, 1990.

Decided Nov. 15, 1990.

Timothy Kellett of St. Louis, Mo., for petitioner.

Scott MacDonald, Washington, D.C., for respondent.

Before JOHN R. GIBSON, Circuit Judge, BRIGHT, Senior Circuit Judge, and MAGILL, Circuit Judge.

MAGILL, Circuit Judge.

GSX Corporation of Missouri petitions for review of a decision of the National Labor Relations Board ordering reinstatement and backpay for all GSX employees laid off from the company's United Disposal Division since the closing of the city incinerators and directing GSX to bargain with Local 610 of the Teamsters as representative of the company's St. Louis Transfer Division. The Board cross-appeals for

enforcement of its order. GSX argues that the Board's determination that GSX violated §§ 8(a)(1), 8(a)(3) and 8(a)(5) of the National Labor Relations Act by discriminating against Local 610 members in layoffs and hiring was not supported by substantial evidence on the record as a whole. We agree and reverse.

I.

GSX provides waste disposal services for residential and commercial sites. The United Disposal Division of GSX (UDD) is divided into a number of smaller units, including a commercial hauling unit that serves businesses; the St. Louis and Illinois Residential Divisions, which serve homes and apartments in their respective areas; and the M & D Division, which serves construction sites. Each of these units has a separate collective bargaining agreement with a Teamsters Local. Local 610, the branch of the Teamsters principally involved in this case, represents the employees of the commercial hauling unit; it also independently represents the St. Louis Residential Division under a separate agreement. Local 525 represents the Illinois Residential Division; and Local 682 represents the M & D Division.

For a number of years, the UDD commercial hauling unit had a contract with the City of St. Louis to haul ash from two incinerators owned and operated by the city to a landfill in Illinois. In 1985, however, the EPA told the city that because of pollution problems the city would have to close the north incinerator by July 1, 1986, and the south incinerator by August 1 of the same year. After the incinerators closed, GSX laid off the twelve UDD employees who had been working there. Some of them were able to keep working for GSX by "bumping" other employees in the commercial hauling unit.[1] During the summer and fall of 1986, GSX laid off fourteen other UDD employees represented by Local 610 due to loss of work.

---

**1.** Under Article X, § 10 of the collective bargaining agreement between Local 610 and GSX, employees whose jobs had been eliminated

could displace less senior employees in the unit if qualified to perform their jobs.

In December 1985, GSX bid on and was later awarded a contract with the city to haul away the trash that formerly had been burned. In July and August of 1986, GSX opened two waste transfer stations, large warehouse-like buildings near the old incinerators where city trash was temporarily dumped, then loaded onto large trucks and taken to a landfill outside the city. Unlike the incinerators, the transfer stations accepted trash from private customers as well. The transfer stations were not made part of UDD but were assigned to a new division, the St. Louis Transfer Division, under separate management. Five of the laid-off workers from the incinerators applied for work at the transfer stations and were hired. By November 1986, about thirty people were working at the waste transfer stations. The work done at the transfer stations was similar to that performed by GSX employees under the incinerator contract. Both operations involved loading the trucks, driving them to the landfill and then dumping the waste. The main difference was that at the incinerators, city employees took care of the on-site operations, including burning the trash, but at the waste transfer stations, GSX employees did all the on-site work. There were also some minor differences in the type of equipment used and, as previously mentioned, the type of waste being hauled away was different—trash in its original state as opposed to ash.

Local 610 did not have a harmonious relationship with the management of the GSX commercial hauling unit. At meetings with union representative John Metz during 1986, UDD District Manager Bob Kania complained about the many grievances filed by the union, characterizing them as "nit-picking," "bullshit," and "chicken shit," and saying he had never had these kinds of problems with the union that represented GSX workers in Ohio. Area Manager Jim Logsdon characterized GSX's dealings with Local 610 as "very strenuous, very tough negotiations, very

time consuming ... to rebut and discuss and settle grievance procedures which we felt in a lot of cases were totally unnecessary...." Randy Kelts, a former incinerator employee who was rehired to work at the transfer stations, testified at the administrative hearing that his supervisor at the incinerator had told him that GSX "wanted to get 610 out and 682 in, or go nonunion because of the hassles with 610 with the grievances all the time."

At a grievance meeting between GSX managers and Local 610, company representatives mentioned that they were bidding on the transfer station contract. Metz, who was there, testified that at that time he assumed this work would be given to Local 610 since the incinerators were being shut down. In July, Metz learned that Local 610 employees would not automatically be assigned to the transfer stations, and he called GSX's regional manager, Richard Volonino, to find out why. Volonino told Metz that the transfer stations would belong to a new division and that Metz should go ahead and organize the transfer station employees. Metz again brought up the subject early in August with Logsdon, asserting that the transfer station work belonged to Local 610 and asking him what was going on. Logsdon told Metz that the transfer station was a new division and "that's all there [is] to it." As informal complaints had done no good, the union then tried another approach, filing roughly twenty grievances under the collective bargaining agreement [2] complaining of GSX's failure to offer the laid-off Local 610 employees jobs at the transfer stations.

During May 1986, GSX officials, including Logsdon and Kania, met several times with Paul Renaude of Local 682 to renegotiate 682's contract with the M & D Division. During one of these meetings, a GSX official mentioned that the company would be opening a new waste transfer division. The possibility of Local 682's representing

---

**2.** The grievances were filed under Article XIV of the collective bargaining agreement, which states: "The Employer shall not direct or require its employees or other persons other than the employees in the bargaining unit here involved, to perform work which is recognized as the work of the employees in said unit...."

the employees of the new division was discussed then and at a later meeting attended by Bob Sansone, president of Local 682. At this later meeting, Sansone expressed concern that Local 682 would be invading Local 610's turf if it tried to organize at the transfer stations. Sansone had had a conversation with John Metz in which Metz had said that the transfer station work belonged to Local 610. The GSX people told Sansone that Metz was wrong because the transfer stations were a new division, not part of UDD. They said that "they would not negotiate with Local 610 because they considered that—it's a new unit, they were not required to negotiate with 610. They would not negotiate with 610. If they couldn't get Local 682, they might have to go somewhere else, including the CIU [Congress of Independent Unions]." One of the GSX managers told Local 682 that GSX had had "many problems with Local 610, many grievances," and that they would prefer a contract with Local 682 because they had a good rapport with the latter. At the same meeting, Bob Kania told Renaude that GSX was interested in hiring some good people at the transfer stations, and Renaude sent several members of Local 682 over to apply. Three to four of these applicants were hired; at least one was turned down.

On August 8, 1986, Local 610 filed an unfair labor practice charge against GSX, alleging that it had violated §§ 8(a)(1), 8(a)(3) and 8(a)(5) of the National Labor Relations Act (Act), 29 U.S.C. § 158(a)(1), (3), (5) (1988). The General Counsel of the National Labor Relations Board (NLRB or Board) issued a complaint on September 17 pursuant to § 10(b) of the Act, 29 U.S.C. § 160(b), alleging that in violation of § 8(a)(3) [3] and (a)(1),[4] GSX had laid off various employees in the bargaining unit, including ten mentioned by name, and had unlawfully failed to reinstate them, because of their membership in Local 610. The complaint further charged that the transfer station operations were an accretion to the bargaining unit [5] and that GSX had violated § 8(a)(5) [6] by refusing to apply the collective bargaining agreement between Local 610 and the commercial hauling unit to the employees at the transfer stations. On November 18, 1986, four days before the administrative hearing, the complaint was amended to plead in the alternative that if the transfer station employees were not an accretion to the original bargaining unit, they constituted a separate unit appropriate for collective bargaining, and that but for GSX's unlawful discrimination against Local 610 members in hiring, Local 610 would have had the support of a majority of the transfer station employees and would have been selected as their bargaining representative.[7] Therefore, the complaint alleged, GSX had violated § 8(a)(5) by refusing to recognize and bargain with Local 610.

On November 18–20, 1986, an administrative hearing was held. In a decision issued March 13, 1987, the administrative law judge (ALJ) held that the waste transfer operations were an accretion to the UDD commercial hauling unit and that GSX had therefore violated § 8(a)(5) and (a)(1) by refusing to apply the existing collective bargaining agreement (CBA) to the trans-

---

3. Section 8(a)(3) makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization...."

4. Section 8(a)(1) forbids an employer "to interfere with, restrain, or coerce" employees in the exercise of their rights to self-organization and collective bargaining. A violation of § 8(a)(3) or § 8(a)(5) is also a violation of § 8(a)(1).

5. I.e., an addition to the existing bargaining unit, as opposed to a new, separate bargaining unit.

6. Section 8(a)(5) forbids an employer "to refuse to bargain collectively with the representatives of his employees...."

7. The complaint was amended a third time at the administrative hearing to name 11 more discriminatees and to clarify that the General Counsel was seeking relief not only for the named employees, but also for any other discriminatees who might be identified later. The employees originally laid off were not necessarily the ones who ended up out of a job, since some of them had seniority and bumped junior employees in the commercial hauling unit.

fer station employees. The ALJ did not reach the § 8(a)(3) discrimination question, which he said would be more appropriately resolved under the grievance procedures of the CBA or in the compliance stage of the unfair labor practice proceeding. He ordered GSX to recognize and bargain with Local 610 as the representative of the employees at the waste transfer stations and to apply the terms of the existing CBA to those employees unless and until a successor agreement was negotiated. GSX was also ordered to process all grievances arising out of its failure to apply the CBA and to make whole any members of the bargaining unit who had suffered losses thereby. The CBA would have prevented GSX from hiring any new employees at the transfer station until all laid-off employees qualified to work there had been recalled.[8]

Both parties filed exceptions and supporting briefs with the Board, which issued its decision on June 15, 1989. *GSX Corp. of Missouri*, 295 N.L.R.B. No. 61, 131 L.R.R.M. (BNA) 1534 (1989). Without explanation, the Board in a footnote rejected the ALJ's finding of accretion, relying instead on the General Counsel's second theory, discriminatory layoff and failure to rehire, to find violations of § 8(a)(1), (a)(3) and (a)(5). Under this theory, the finding of refusal to bargain under § 8(a)(5) is predicated on a finding of discrimination in hiring against Local 610 members, not on failure to apply the existing CBA to the new employees as under the ALJ's decision. The Board further found that the transfer station employees constituted a new appropriate bargaining unit separate from the commercial hauling unit. The Board ordered reinstatement and backpay with interest for all of the laid-off employees from the commercial hauling unit, not

merely those whose layoffs had been found to be unlawful. It also ordered GSX to recognize and bargain with Local 610 as representative of the new unit of transfer station employees. The Board arrived at this result by analogy to one of its earlier decisions which held that where a successor employer refuses to hire employees of its predecessor because of their union affiliation, the union's presumption of majority status continues just as it would if the successor had hired those employees, since the employer's discriminatory hiring is a but-for cause of the union's loss of majority status. *See Love's Barbeque Restaurant*, 245 N.L.R.B. 78 (1979), *enforced in relevant part sub nom. Kallmann v. NLRB*, 640 F.2d 1094 (9th Cir.1981). The Board stated that a bargaining order was even more appropriate in the single-employer case than in a successorship context since the employer already has an established bargaining relationship with the union. The Board further reasoned that a bargaining order was especially appropriate in this particular case because the new transfer station unit was a substitute for part of the existing unit represented by Local 610—the incinerator operation.

GSX filed a petition for review of the Board's order on August 11, 1989. The Board cross-appealed for enforcement of its order. This court has jurisdiction under § 10(e) and (f) of the Act, 29 U.S.C. § 160(e)–(f).

## II.

■ Subsections 10(e) and (f) of the Act provide that the Board's findings with respect to questions of fact are conclusive if supported by substantial evidence on the

---

**8.** The relevant provisions of the collective bargaining agreement are:

Article X, § 1: "In all cases of decreasing the working force or recalling from layoff, the only factors to be considered will be the length of continuous service with the Company as provided in Sections 10 and 11 of this Article."

Article X, § 10: "When there is an excess number of employees in a classification, the employee in that classification with the shortest service with the Employer shall be the one removed from the classification. Such removed employ-

ee, only if qualified to immediately perform the applicable, available work, shall be permitted to displace the most junior employee in the job classification and on the shift for which he exercises his displacement option."

Article X, § 11: "Employees laid off or bumped back shall be recalled in reverse order of having been laid off or bumped back before any new employees are hired. Employees who are recalled must be qualified to perform the work in question."

*See also* Art. XIV, *infra* note 2.

record considered as a whole. 29 U.S.C. § 160(e)–(f). This court must enforce the Board's order if the Board has correctly applied the law and if its findings rest upon substantial evidence. *NLRB v. Vincent Brass & Aluminum Co.*, 731 F.2d 564, 566 (8th Cir.1984).

GSX argues that the following findings of the Board are not supported by substantial evidence: first, that GSX unlawfully laid off its twelve incinerator employees because of their membership in Local 610; second, that GSX unlawfully refused to hire twenty-one of the laid-off Local 610 employees[9] for its new St. Louis Transfer Division; and finally, that GSX unlawfully refused to recognize and bargain with Local 610 as the representative of the St. Louis Transfer Division employees.

■■■ Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938), *quoted in S. W. Noggle Co. v. NLRB*, 478 F.2d 1144, 1145 (8th Cir.1973), and "must do more than create a suspicion of the existence of the fact to be established," *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939), *quoted in NLRB v. Garner Tool & Die Mfg.*, 493 F.2d 263, 268 (8th Cir.1974). Whether a layoff or hiring decision constitutes illegal discrimination under § 8(a)(3) is a question of fact for the Board. *See NLRB v. Des Moines Foods, Inc.*, 296 F.2d 285, 290 (8th Cir.1961); *NLRB v. Brown & Root, Inc.*, 203 F.2d 139, 147 (8th Cir.1953); *NLRB v. Winona Knitting Mills, Inc.*, 163 F.2d 156, 160 (8th Cir.1947). Where, as here, the Board's findings are contrary to the ALJ's, the court will review the Board's findings more critically. *Colson Equip., Inc. v. NLRB*, 673 F.2d 221, 223 (8th Cir. 1982). Although the substantial evidence standard still applies, *Paintsmiths, Inc. v. NLRB*, 620 F.2d 1326, 1329 (8th Cir.1980),

the Board's evidence must be stronger than would be required in a case where it had accepted the ALJ's findings, *Colson*, 673 F.2d at 223–24, since the ALJ's opinion is part of the record against which the substantiality of the evidence must be measured, *Paintsmiths*, 620 F.2d at 1329.

The Board's position is that the layoffs of the incinerator employees were unlawful, but that the other fourteen layoffs in the commercial hauling unit were not. Nevertheless, it has ordered reinstatement and backpay for all of the laid-off employees. Both groups were laid off because of lack of work: the incinerator employees as a result of a government order, the others as a result of loss of work from contracts with private parties. The Board's argument as to the incinerator employees is that but for the company's dislike of Local 610, they would not have been laid off but would have been transferred to the new waste transfer division. Presumably, the same argument would apply to the other laid-off members of the commercial hauling unit, as the loss of work on their contracts occurred at about the same time. We therefore find it difficult to understand why the Board finds one group of layoffs unlawful and the other lawful, nor does the Board's opinion enlighten us on this point. Likewise, we are puzzled as to why GSX's failure to recall the second group of employees was unlawful if laying off these employees did not violate the Act even though there were jobs available at the transfer stations. We can find nothing in the record to justify the Board's inconsistent resolution of these issues.

■■ GSX argues that it laid off the incinerator employees not out of any desire to rid itself of Local 610, but simply because the EPA ordered the city to shut down the incinerators. Similarly, it argues that it did not rehire the rest of the laid-off workers because they did not apply, not because they belonged to Local 610. We evaluate these contentions under the analysis set

---

9. The arithmetic of this case bears repeating: GSX laid off 12 incinerator workers and 14 other employees from the same bargaining unit, the commercial hauling unit of UDD. The company later hired five of the former incinerator workers for the transfer stations, leaving 21 unit members without jobs.

forth by the Board in *Wright Line*, 251 N.L.R.B. 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), and approved by the Supreme Court in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). The General Counsel must first establish a prima facie case of unlawful discrimination by proving that the employee's union membership or activity was a motivating factor in the employer's decision to lay off or not to rehire the employee; the burden then shifts to the employer to show that it would have taken the same action even without the employee's union affiliation. 462 U.S. at 399, 103 S.Ct. at 2473; *see also Vincent Brass & Aluminum*, 731 F.2d at 566–67. By asserting a legitimate reason for its decision and showing by a preponderance of the evidence that the legitimate reason would have brought about the same result even without the illegal motivation, an employer can establish an affirmative defense to the discrimination charge. *See International Hat Co. v. NLRB*, 771 F.2d 1170, 1172 (8th Cir.1985).

The Board concluded that the General Counsel had established a prima facie case of unlawful discrimination. It found that the statements by GSX management quoted in Section I established hostility toward Local 610 and indicated that GSX had an unlawful motive for its actions. The Board found GSX's asserted reasons for the layoffs and failure to rehire unconvincing and held that they were insufficient to rebut the General Counsel's initial showing of discrimination.

 While hostility to the union is a proper and highly significant factor for the Board to consider when assessing whether the employer's motive was discriminatory, *NLRB v. Superior Sales, Inc.*, 366 F.2d 229, 233 (8th Cir.1966), *quoted in Berbiglia, Inc. v. NLRB*, 602 F.2d 839, 843–44 (8th Cir.1979), and the Board may draw any reasonable inference from the evidence, *NLRB v. Chem Fab Corp.*, 691 F.2d 1252, 1259 (8th Cir.1982), including an inference that an employer's discharge or failure to

rehire union employees was motivated at least in part by an illegal desire to get rid of the union, *Lemon Drop Inn, Inc. v. NLRB*, 752 F.2d 323, 325 (8th Cir.1985), general hostility toward the union does not itself supply the element of unlawful motive, *Superior Sales*, 366 F.2d at 233. The evidence of anti-union discrimination in this case, apart from the layoffs themselves, is limited to the anti-union statements relied on by the Board. These statements are sufficient to support an inference of hostility toward the union, but they are relatively mild compared to the evidence of anti-union hostility and discrimination in some of the recent § 8(a)(3) cases in this circuit: *see York Prods., Inc. v. NLRB*, 881 F.2d 542 (8th Cir.1989) (management threatened approximately fifty times to close the plant if the union came in and told employees to stop wearing union buttons if they knew what was good for them); *DeQueen Gen. Hosp. v. NLRB*, 744 F.2d 612 (8th Cir.1984) (administrator told supervisors to "be rough on [union] employees and should any reason arise to get rid of an employee to use that opportunity"; management interrogated employees about union membership and threatened them with disciplinary action or discharge); *Ballou Brick Co. v. NLRB*, 798 F.2d 339 (8th Cir.1986) (employer created the impression of surveillance of union activities, threatened employees and encouraged them to report union activities); *NLRB v. Quick Find Co.*, 698 F.2d 355 (8th Cir.1983) (coercive interrogation, laying off all but two employees in the proposed bargaining unit after the union filed a petition for recognition). "In determining whether there exists substantial evidence on the record as a whole we must view the inherent strengths and weaknesses of the inferences drawn by the Board." *NLRB v. American Postal Workers Union*, 618 F.2d 1249 (8th Cir.1980) (quoting *NLRB v. Wal–Mart Stores, Inc.*, 488 F.2d 114, 117 (8th Cir.1973)). The weaker a prima facie case against an employer under the *Wright Line* test, the easier it is for the employer to meet its burden of proving that the same decision would have been made even if the employee had not be-

longed to the union. *Doug Hartley, Inc. v. NLRB*, 669 F.2d 579, 582 (9th Cir.1982).

Here it is undisputed that the closing of the incinerators was not a voluntary business decision by the company, but was ordered by the EPA. The NLRB does not claim that the closing was a scheme to oust Local 610. Nor has the General Counsel argued that when GSX loses a contract, it customarily transfers the employees who were doing that work to a different division of the company rather than laying them off. Under these circumstances, a shutdown order issued by the government is a legitimate reason for the layoffs. We therefore hold that GSX has met its burden of showing that the layoffs would have occurred anyway and that the Board's finding that the incinerator workers were discharged in violation of § 8(a)(3) and (a)(1) is not supported by substantial evidence on the record as a whole.

In *NLRB v. Yeshiva Univ.*, 444 U.S. 672, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980), the Supreme Court said courts do not owe deference to the NLRB's decisions when they are based on "conclusory rationales" rather than on examination and analysis of the facts. 444 U.S. at 691, 100 S.Ct. at 867. Here, the Board rejected the ALJ's finding of accretion without any discussion at all; in fact, it rejected that finding in a *footnote*. Also in a footnote, the Board disposed of the failure-to-apply issue by stating, without explanation or citation of precedent, that union representative John Metz's "request" for the work (his telephone calls to GSX management to ask why Local 610 was not being assigned the transfer station work) and the grievances filed under the collective bargaining agreement together constituted a proper application for employment. It never addressed the legal issue of whether and under what circumstances an application is necessary in order to prove discrimination by the company.

■ As to the charge of discriminatory failure to recall the incinerator employees and the fourteen other Local 610 members laid off as a result of lack of work, GSX asserts that the reason it hired only five of the Local 610 members for the St. Louis Transfer Division was that only five of them applied. The NLRB argues in response that under its decision in *A–1 Schmidlin Plumbing & Heating Co.*, 284 N.L.R.B. 1506, 126 L.R.R.M. (BNA) 1027 (1987), *enforced without opinion*, 865 F.2d 1268 (6th Cir.1989), the employees were not required to file applications in order to be hired, as "it is settled that discriminatees' failure to file employment applications does not defeat their right to reinstatement." Respondent's Brief at 19. The NLRB is partially correct; case law in this and other circuits makes it clear that under some circumstances § 8(a)(3) discrimination can be proved even if the discriminatee has never officially applied for the job. *See Packing House & Indus. Servs., Inc. v. NLRB*, 590 F.2d 688, 695–96 (8th Cir.1978); *Sterling Aluminum Co. v. NLRB*, 391 F.2d 713, 724 (8th Cir.1968); *Schmidlin*, 126 L.R.R.M. (BNA) at 1028–29; *Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076, 1087 (3d Cir.1984). In these cases, however, it would have been futile for the unionized employees to apply since the company had already made it clear to them that it would not hire them, or else that it would not hire them unless they gave up their union membership.

■ The case before us is not like cases in which courts have held that discriminatory refusal to hire was shown even though the discriminatee did not apply or did not fulfill all of the application requirements. *See Packing House*, 590 F.2d at 695–96 (successor employer not entitled to insist on individual applications from predecessor's employees where plant manager had been specifically instructed not to hire any of them and company had hired other employees who had not filled out applications); *Sterling Aluminum Co.*, 391 F.2d at 724 (former employee did not have to schedule interview with personnel manager when plant manager had already told him the company would not rehire him); *NLRB v. J. S. Alberici Constr. Co.*, 591 F.2d 463, 468 (8th Cir.1979) (man who applied for ironworking job when nothing was available did not have to reapply later since company had promised to call him if a job

for which he was qualified opened up); *Schmidlin*, 126 L.R.R.M. (BNA) at 1028–29 (discrimination found even though union member did not apply for job because prospective employer told him he would not be hired unless he gave up his union membership); *Kobell*, 731 F.2d at 1080–81 (manager told union member acquiring company would not hire former employees unless they switched to another union; company lied about when applications were due and when jobs were available); *Kallmann*, 640 F.2d at 1096–97, 1099–1101 (fact that only seven of predecessor's forty employees applied for job with successor employer did not preclude bargaining order against successor when successor resorted to unusual hiring procedures designed to conceal the availability of jobs from those employees); *Piasecki Aircraft Corp. v. NLRB*, 280 F.2d 575, 582 (3d Cir.1960) (company announced that it was interviewing applicants, but union members found the door locked when they came to apply; meanwhile, company was surreptitiously letting in non-union applicants), *cert. denied*, 364 U.S. 933, 81 S.Ct. 380, 5 L.Ed.2d 365 (1961).

This is not a case in which it would have been futile for union members to apply. Five members of Local 610 did apply and were hired. There were no irregularities in the application process, nor were Local 610 members discouraged from applying or told they would not be hired. No attempt was made to conceal from the laid-off workers or their union the opening of the new division or the fact that GSX was hiring. Indeed, a GSX manager told a Local 610 representative to go ahead and try to organize the new unit, and Randy Kelts, one of the laid-off incinerator workers, testified that his former supervisor suggested that he apply at the transfer stations and offered to recommend him for employment there. Edward Taylor, another former incinerator worker who testified for Local 610 at the hearing, said that he did not apply although he knew of other workers from the incinerators who had applied and been hired. When the ALJ asked why, Taylor said it was because the employees who were hired had received offers, but he had not. On cross-examination, however, Taylor said that these job offers were received *after* the employees had filled out applications, and the union's lawyer did not pursue the subject on redirect.

This case is closer to *Vantage Petroleum Corp.*, 247 N.L.R.B. 1492, 103 L.R.R.M. (BNA) 1408, 1411 (1980), than to cases in which courts have found discrimination even though the union members seeking relief did not file applications. In *Vantage*, a non-union employer contracted with the state of New York to operate gas stations formerly staffed by a unionized company. When the union steward asked the new contractor whether it would hire the union members then working at the gas stations, the latter said he could make no decisions at that time but would accept applications from anyone and everyone. None of the union employees applied until several weeks later when the jobs had already been filled. The Board held that the new contractor had "no obligation ... to initiate the employment relationship" and "was within its rights to expect that persons seeking employment with it would first submit applications." 103 L.R.R.M. (BNA) at 1411.

In its brief, the Board cites a number of cases in which § 8(a)(3) discrimination was found when an employer closing one facility and opening a new facility nearby laid off unionized employees from the old facility instead of transferring them to the new one. These cases are inapplicable to the present situation because, like the failure-to-apply cases discussed earlier, they involve evidence of discriminatory conduct not found in the case before us. *See M & G Convoy, Inc.*, 260 N.L.R.B. 1052 (1982), *enforced without opinion*, 707 F.2d 1402 (3d Cir.1983) (although many employees from old facility requested a transfer, company did not hire a single one for the new facility); *NLRB v. National Car Rental Sys., Inc.*, 672 F.2d 1182 (3d Cir.1982) (employer flatly refused even to consider any union employees for transfer); *Safelite, Div. of Lear Siegler, Inc.*, 277 N.L.R.B. 782 (1985) (company made false and misleading statements to union designed to conceal construction and opening of new facility).

In the present case, GSX accepted applications from anyone interested in working at the transfer stations and hired every one of the laid-off Local 610 members who applied. It did not conceal the availability of jobs at the transfer stations or mislead Local 610 as to when the new facility would open. A reviewing court of appeals "has the right and duty to reject a conclusion of the Board that disregards or fails to give proper cognizance of uncontradicted or well-established facts." *NLRB v. Winona Textile Mills, Inc.*, 160 F.2d 201, 208 (8th Cir.1947). Here, the Board barely mentioned the fact that GSX hired all of the laid-off incinerator workers who applied, and did not at all consider its effect on the sufficiency of the evidence.

The result in this case might be different if at least some of the Local 610 members who applied for work at the transfer stations had been rejected; if there were some evidence that GSX did not go "by the book" in its hiring procedures but showed favoritism by exempting non-Local 610 members from the driving test or from having to fill out a written application, *see Packing House*, 590 F.2d at 695; or if GSX had had a history of filling vacancies at new operation sites with laid-off personnel from other sites, *see NLRB v. New England Tank Indus., Inc.*, 302 F.2d 273, 276–77 (1st Cir.), *cert. denied*, 371 U.S. 875, 83 S.Ct. 147, 9 L.Ed.2d 114 (1962); *Alberici Constr. Co.*, 591 F.2d at 469. The outcome also might be different if the Board had presented additional arguments supported by evidence in the record: for example, if it had contended that the management of the Transfer Division deliberately hired less than fifty percent of its work force from the laid-off UDD employees in order to make sure that Local 610 did not get a majority and become the bargaining representative of the new unit, *see Retail Clerks Int'l Union, Local 655 v. Quick Shop Mkts., Inc.*, 604 F.2d 581, 586–87 & n. 7 (8th Cir.1979); or if the Board had demonstrated that for some other reason it would have been futile for the remaining twenty-one jobless members of Local 610 to apply for jobs at the transfer stations, *see Packing House*, 590 F.2d at 696; *Piasecki Aircraft*,

280 F.2d at 590. Any one of these might provide an adequate basis for concluding that there was substantial evidence in the record to support the Board's decision. As the record now stands, however, we find no reason to disbelieve GSX's explanation for not hiring its laid-off workers. Common sense dictates that to be hired for a job one must apply, and a company is justified in relying on that rule unless there is some indication that it is being used as an excuse. *See Packing House*, 590 F.2d at 695; *Vantage Petroleum*, 103 L.R.R.M. (BNA) at 1411.

Under the *Wright Line* test, GSX has shown a legitimate reason for its decision by a preponderance of the evidence. We therefore hold that the Board's findings of discriminatory layoffs and hiring in violation of § 8(a)(3) are not supported by substantial evidence on the record as a whole. Necessarily, the Board's other two findings, that GSX violated § 8(a)(5) by refusing to bargain with Local 610 and § 8(a)(1) by interfering with its employees' rights to self-organization and collective bargaining, must fail as well since they derive from the findings of discriminatory layoffs and hiring and have no independent factual basis.

### III.

Because we find that the decision of the Board is not supported by substantial evidence on the record as a whole, we refuse to enforce the Board's order.

BRIGHT, Senior Circuit Judge, dissenting.

I dissent.

In my view, the lengthy recitation of the record by the majority demonstrates that in order to reverse this court was required to make findings of fact anew. That is not our function as an appellate court.

We are obligated to enforce the Board's order where the underlying findings of fact are supported by substantial evidence based on the record as a whole. *O'Leary v. Brown–Pacific–Maxon, Inc.*, 340 U.S. 504, 508, 71 S.Ct. 470, 472, 95 L.Ed. 483

(1951); 29 U.S.C. § 160(e) (1988). Here, the Board's findings have adequate support in the record. Accordingly, I would enforce the order in question.