**MIDLAND TRANSPORTATION COMPANY, INC.,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MIDLAND TRANSPORTATION COMPANY, INC.,**
Respondent.

Nos. 91–2995, 91–3335.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 12, 1992.

Decided May 4, 1992.

John F. Veldey, Marshalltown, Iowa, argued (John B. Grier, on brief), for petitioner Midland Transp. Co., Inc.

Karen L. Arndt, Washington, D.C., argued (Paul J. Spielberg, Jerry M. Hunter, D. Randall Frye and Aileen A. Armstrong, on brief), for respondent N.L.R.B.

Before BOWMAN, WOLLMAN, Circuit Judges, and WOODS,* District Judge.

BOWMAN, Circuit Judge.

Midland Transportation Company ("Company") petitions for relief from an order of the National Labor Relation Board ("NLRB") holding that the Company violated sections 8(a)(1) and (3) of the National Labor Relations Act ("Act"), 29 U.S.C. § 158(a)(1) and (3) (1988), by maintaining an overly broad no-solicitation rule, threatening employees with reprisals because of union activity, coercively interrogating employees about union activities, and disciplining employees because of union activity.[1] The alleged violations occurred in early 1990, shortly before an unsuccessful union organizing election in April 1990.[2] We affirm in part and reverse and remand in part.

## I.

The NLRB held that Midland's no-solicitation rule violated section 8(a)(1) of the Act because it was overly broad.[3] Midland concedes that its original rule, set forth in the employee handbook, is presumptively invalid but argues that it was amended by a later memorandum so that the no-solicitation rule, as modified, is presumptively valid.

The original no-solicitation rule enacted by the Company states that "[e]mployees shall refrain from solicitations of any sort during working hours." Midland Transportation Employee Handbook at 5, *reprinted*

---

* The HONORABLE HENRY WOODS, United States District Judge for the Eastern District of Arkansas, sitting by designation.

1. The NLRB filed a cross-application seeking enforcement of its order.

2. Chauffeurs, Teamsters and Helpers Local Union No. 238 began the organizational drive in January 1990 and is the union whose representation was rejected.

3. Section 8(a)(1) states that "[i]t shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." 29 U.S.C. § 158(a)(1) (1988). These guaranteed rights include the right to "self-organization, to form, join, or assist labor organizations ... and ... to engage in other concerted activities for the purpose of collective bargaining." 29 U.S.C. § 157 (1988).

*in* Petitioner's Appendix at 196, 199. Work rules prohibiting solicitation during "working time" are presumptively valid while rules prohibiting solicitation during "working hours" are presumptively invalid. *NLRB v. Rooney*, 677 F.2d 44, 45 (9th Cir.1982). Thus, as the Company concedes, its original no-solicitation rule is presumptively invalid. Instead of attempting to overcome such a presumption by, for example, showing "that a ban is necessary to maintain plant discipline or production," *Eastex, Inc. v. NLRB*, 437 U.S. 556, 571, 98 S.Ct. 2505, 2515, 57 L.Ed.2d 428 (1978), the Company argues that a letter, distributed to its employees shortly after the beginning of union activity, clarified the original no-solicitation rule so that the rule, as modified, is presumptively valid.

David Mattox, vice-president of the Company, testified that once he "became aware of the union activities that were underway" in February 1990, he felt it necessary to clarify certain rules contained in the employee handbook. *In re Midland Transp. Co.*, Nos. 18–CA–11218, 18–RC–14755 (NLRB Hearing of June 21, 1990), Transcript at 165 [hereinafter Transcript]. He then distributed a letter to the drivers and dockmen (the employees subject to the union organizing drive) on or about February 26. Mattox agreed that paragraph six of the letter was "intended to clarify when union activities could be carried on [sic] Midland's property." *Id.* at 167. Paragraph six of the letter states that "[n]o person will be allowed to carry on union organizational activity during actual working time. Anyone who does so in other than nonworking mealtimes or breaktimes will be subject to discipline." *In re Midland Transp. Co.*, Nos. 18–CA–11218, 18–RC–14755 (NLRB Hearing of June 21, 1990), Respondent Exhibit # 1 [hereinafter Company Letter]. The Company asserts that this change to the original no-solicitation rule is sufficient to render the Company's "overall" no-solicitation policy presumptively valid. The Board held otherwise, adopting the finding of the adminis-

trative law judge ("ALJ") that paragraph six was "intended to discourage union activities rather than serve a valid management concern." *In re Midland Transp. Co.*, Nos. 18–CA–11218, 18–RC–14755, Decision and Report on Objections at 4 (April 3, 1991) [hereinafter Decision of ALJ].[4]

■ Our review of the Board's findings is limited to determining whether they are supported by substantial evidence on the record as a whole. *GSX Corp. v. NLRB*, 918 F.2d 1351, 1355–56 (8th Cir.1990). We may not substitute our interpretation of the evidence for the Board's reasonable inferences. *NLRB v. United Ins. Co. of America*, 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968). Based on our examination of the record as a whole, we are satisfied that the Board's decision not to treat the February 27 letter as a sufficient modification of the Company's otherwise presumptively invalid no-solicitation rule is reasonable and is supported by substantial evidence.

■ Mattox testified that the "clarification letter" was created in response to union activity at the Company, not because of a previously perceived deficiency in the rules stated in the employee handbook. Paragraph six makes no reference to the no-solicitation rule it allegedly is modifying, nor does it refer to any form of solicitation other than union solicitation. Instead, it is part of a letter that contains arguments against the union and warnings against certain conduct. These warnings include paragraph five, which states that "[i]f anyone causes you any trouble at your work, or puts you under any pressure to join a union, do not hesitate to contact [David Mattox]. Every legal means will be taken to see to it that such activity is stopped." Company Letter. Paragraph seven states that the Company will take "every ethical and legal step, proper and right, to oppose this union's attempt to do our employees' talking for them, unless ... the majority of our employees give up this

---

**4.** The Board adopted the findings of the ALJ *in toto. In re Midland Transp. Co.*, Nos. 18–CA–11218, 18–RC–14755, Decision, Order, and Di-

rection of Second Election at 1–2 (August 12, 1991).

right." *Id.* Finally, none of the employees who testified stated that they knew that the original no-solicitation rule had been modified. Two employees stated that they were not aware that the original rule had been modified, while another employee testified that none of the items in the handbook were ever "explained" to him. In these circumstances, we cannot say there is not substantial evidence on the record as a whole to support the Board's findings. *Cf. Ballou Brick Co. v. NLRB*, 798 F.2d 339, 346 (8th Cir.1986) (modifying statement sufficient to render an otherwise invalid statement valid was made two weeks before the start of the union campaign, was announced in affirmative terms, and there was "no evidence that the employees did not know of the rule change"). [5]

## II.

The NLRB found that on three occasions a supervisor or manager of the Company interrogated or threatened employee Alan Maxfield in violation of section 8(a)(1). The Company contends that the comments are privileged and not a violation of section 8(a)(1) because Maxfield was not an employee covered by the Act but instead was a supervisor or managerial employee.[6] The Company concedes that the comments in question, if made to a covered employee, would violate section 8(a)(1).

In support of their argument, the Company points out: (1) Maxfield drove a truck only about eight hours out of his fifty-hour week, while the remainder of his work time was spent in the office; (2) his primary duty was to plan the daily truck routes of the drivers; (3) he helped decide route changes; (4) he was responsible for determining which routes were profitable; and (5) he was involved in the decision to call replacement drivers when the need arose. Maxfield also testified that he considered his job as router a promotion from his previous job as a driver. In support of its finding, the Board notes that Maxfield's duties as a router were routine clerical chores that required no independent judgment but consisted mainly of compiling and totalling routing slips. The Board notes that any possible changes in a truck's regular route were discussed with and approved by Maxfield's supervisor. Further, Maxfield testified that: (1) he was paid the same hourly rate as he was when he was a full-time truck driver; (2) prior to the union campaign he was never told that he was a management employee; (3) he never attended management meetings; (4) he was never involved in developing company policy; and (5) he never hired, fired, interviewed, transferred, disciplined, or suspended any employee or potential employee. He also stated that he was not allowed to change regular routes, grant employees days off, excuse absences, approve vacations, or resolve grievances, and testified that he received the same pay and benefits as the drivers.

For the reasons enunciated in our recent decision in *Schnuck Markets, Inc. v. NLRB*, 961 F.2d 700, 703-04 (8th Cir.1992), heightened judicial review of Board determinations of supervisory status is necessary. However, based on the evidence outlined above, and on the record as a whole, we are satisfied that here, unlike the situation in *Schnuck Markets*, the Board's determination that Maxfield was an employee covered by the Act is supported by substantial evidence. We therefore affirm the Board's holding that the Company violated section 8(a)(1) by unlawfully interrogating and threatening Maxfield.[7]

---

5. Thus, we affirm the Board with respect to its finding that the Company's no-solicitation rule violates section 8(a)(1). To the extent that the Board separately found that paragraphs five and six of the Company Letter also constitute violations of section 8(a)(1); we reverse the Board's order as its complaint, which was never amended, alleged only that the Company's no-solicitation rule contained in the employee handbook is invalid.

6. The Act's protections do not apply to those employees who have the authority to "hire,

transfer, suspend ... promote, discharge ... reward, or discipline other employees, or responsibly to direct them ... if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." 29 U.S.C. § 152(11) (1988); *see* 29 U.S.C. §§ 152(3) & 158 (1988).

7. It is immaterial that, as the Company claims, the Company erroneously but in good faith be-

## III.

The Board also found that the Company violated section 8(a)(1) by subjecting employee Mark Phillips to a comment that threatened adverse consequences if the union were to succeed in organizing the Company's employees. In this instance, the Company does not dispute the fact that Phillips was an employee covered by section 8(a)(1) at the time of the alleged incident. Instead, the Company's challenge to this finding rests primarily on a denial that the comment ever was made.[8]

■■■ Phillips, a truck driver for the Company during the time period relevant to this issue, testified that during an argument with his supervisor Terry Jesperson about the length of Phillips's hair, Jesperson said that at his previous place of employ, when the union came in many of the employees eventually lost their jobs. Jesperson testified that he made no such comment. The ALJ credited Phillips's testimony and discredited Jesperson's. Among the ALJ's reasons for this finding was the fact that Jesperson's testimony on a variety of issues was modified or contradicted on cross-examination and by other Company witnesses.

In cases where there is conflicting testimony,

it is the sole prerogative of the ALJ to make credibility findings. This court must assess the record on the basis of whether substantial evidence, on the record as a whole, supports the Board's findings. In evaluating the record in this light we are admonished to give weight to the ALJ's finding and not to substitute our own factfinding for that of the Board.

*DeQueen Gen. Hosp. v. NLRB*, 744 F.2d 612, 617 (8th Cir.1984). "Absent a showing of extraordinary circumstances, we defer to the Board's credibility determinations." *NLRB v. Quick Find Co.*, 698 F.2d 355, 359 (8th Cir.1983). Here, we have been shown no reason for not giving deference to the Board's determination to credit Phillips's testimony rather than Jesperson's. Accordingly, on the record before us, we cannot say the Board's finding that Jesperson's comments to Phillips violated section 8(a)(1) is unsupported by substantial evidence.

## IV.

The Company next challenges the Board's determination that the Company violated section 8(a)(1) by unlawfully interrogating employee Lyndon Walter about how Walter was going to vote in the April 1990 union election. Greg Mattox, the general manager of the Company, called Walter into Mattox's office on February 22, 1990, to talk about an allegation that Walter had threatened other employees with reprisals if they voted against the union. At this meeting, Walter denied making such threats. According to Walter, Mattox then asked Walter how he was going to

---

lieved Maxfield was a managerial employee not covered by the Act. *See Road Sprinkler Fitters Local Union No. 669 v. NLRB*, 681 F.2d 11, 19 n. 7 (D.C.Cir.1982) ("The employer's intent to interfere with employee rights is not a necessary element of the unfair labor practice."), *cert. denied*, 459 U.S. 1178, 103 S.Ct. 831, 74 L.Ed.2d 1025 (1983).

8. The Company's argument that the comment, if made, was not violative of section 8(a)(1) may be disposed of quickly. Phillips testified that Terry Jesperson said that he previously

"worked for All American Freight and those guys over there, they wanted to go union too and I told them ... that that's a bad deal ... trying to go union and ... I talked to them

about it and they didn't give a 'fuck' ... and they had their union vote and they went union. Fourteen guys lost their jobs, now they are driving around in old cars trying to find a job."

Transcript at 82 (Phillips quoting Jesperson). The Company argues correctly that, if this statement was made and is true, there is no section 8(a)(1) violation because a supervisor may relate personal experiences to employees. However, Jesperson testified that during the time he worked for All American, it was always unionized. Thus, his comment to Phillips, if made, would not be a true statement of a personal experience. Therefore, if Jesperson made the comment attributed to him by Phillips, an unfair labor practice occurred.

vote in the upcoming union election. Walter testified that he responded that he was going to vote for the union, and that Mattox told him that the employees should think about what they are doing. On direct examination, Walter testified that Mattox "inferred that I should play fair." Transcript at 51. He also testified that Mattox brought up the allegation that Walter had been bringing a seven- or eight-inch hunting knife to work. On cross-examination, Walter confirmed that Mattox told him that Mattox "wasn't going to do anything to stop union organizing at Midland," and that Mattox "emphasized that [Mattox] wanted to make sure that both sides played fair and that there weren't threats." *Id.* at 62. Walter also testified that he understood Mattox to mean that Mattox did not want threats from either Walter or the Company.

▮ "[I]nterrogation of employees may be permissible if (1) the employer has a valid purpose for obtaining information ...; (2) this purpose is communicated to the employees; and (3) the employees receive assurances that no reprisals will be taken." *NLRB v. Intertherm, Inc.*, 596 F.2d 267, 274 n. 2 (8th Cir.1979). To determine whether an interrogation about an employee's union activities is proper we must look at the surrounding circumstances, which include (1) evidence of past employer hostility and discrimination; (2) the type of information sought; (3) the questioner's identity; (4) the means and location of the interrogation; and (5) the veracity of the reply. *See id.* at 274. The information sought conceivably could be used against Walter and the position of Mattox in the Company and the location of the questioning alert us to the potential for coercive interrogation. However, there is no evidence that Mattox's questioning of Walter inspired fear of reprisal; Walter truthfully told Mattox of his support for the union. Walter admitted that Mattox stressed that he wanted both sides to play fair and that he was not going to do anything to stop union organizational activity.

In addition, Mattox had a legitimate purpose for the conversation with Walter—he had received reports that Walter was threatening fellow employees if they did not support the union, and he had heard that Walter was bringing a hunting knife to work. After reviewing the record as a whole, we hold there is insufficient evidence to support the Board's finding that the Company violated section 8(a)(1) by questioning employee Walter about his support for the union.

### V.

Next, the Company challenges the Board's ruling that the Company violated section 8(a)(1) and (3) of the Act by disciplining employee Walter because of his union activities.[9] The Board held that Walter's three-day suspension was prompted by his support for the union; the Company claims that he was suspended for directing profanity towards an office employee.

This issue is analyzed in the following manner:

> The [Board] must first establish a prima facie case of unlawful discrimination by proving that the employee's union ... activity was a motivating factor in the employer's decision to [suspend] the employee; the burden then shifts to the employer to show that it would have taken the same action even without the employee's union affiliation. By asserting a legitimate reason for its decision and showing by a preponderance of the evidence that the legitimate reason would have brought about the same result even without the illegal motivation, an employer can establish an affirmative defense to the discrimination charge.

*GSX Corp.*, 918 F.2d at 1357 (citations omitted).

On February 21, 1990, Walter was asked by a woman who worked in the Company office to distribute notices of a mandatory employee meeting about the union to his fellow employees. After Walter read the

---

9. Section 8(a)(3) states that it is an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3) (1988).

notice, he made a vulgar and offensive remark to the female employee.[10] The next day he met with Greg Mattox, who did not mention the incident. *See* Part IV, *supra*. On February 23, Walter's day off, he was called at home and told to call David Mattox. David Mattox read a report of the incident with the office employee over the phone to Walter, and informed Walter that he was suspended for three days because of the incident.

 The Board's argument rests primarily on evidence of anti-union animus on the part of the Company. "[H]ostility to the union is a proper and highly significant factor for the Board to consider when assessing whether the employer's motive was discriminatory." *GSX Corp.*, 918 F.2d at 1357. However, anti-union animus, standing alone, "does not itself supply the element of unlawful motive." *Id.* Moreover, although it is clear the Company did not welcome the union's efforts to organize the Company's employees, there is little evidence here of overt hostility. *See id.* (the evidence of anti-union animus is "relatively mild compared to the evidence of anti-union hostility and discrimination in some of the recent § 8(a)(3) cases in this circuit"). Having concluded that the Board has failed to make the requisite prima facie showing of unlawful discrimination, we hold that there is insufficient evidence on the record as a whole to support the Board's finding that the Company violated section 8(a)(1) and (3) by suspending Lyndon Walter.[11]

## VI.

The Company also challenges the Board's finding that the Company violated sections 8(a)(1) and (3) by firing employee Mark Phillips for his union activities. The Company claims that Phillips was fired for directing a profanity at his supervisor and refusing to apologize.[12]

Using the same analysis applied in Part V, *supra*, we accept the Board's finding that a prima facie case of unlawful discrimination has been established, as we previously have upheld the Board's finding that Phillips was unlawfully threatened by his supervisor, Terry Jesperson. *See* Part III, *supra*. Further, he was fired on the day that he became active in the union's organizational effort. Thus, the burden shifted to the Company to produce evidence that Phillips was fired for a legitimate business reason.

After commenting to Phillips on a couple of occasions regarding the length of Phillips's hair, on February 12 Jesperson told Phillips that he should get his hair cut. Phillips responded that Midland employees at another facility were allowed to keep long hair. Jesperson replied that what other facilities allowed was immaterial; Jesperson wanted his subordinates to keep their hair neat. To that, Phillips responded " '[B]ullshit,' I work for Midland Transportation," and ended the conversation. Transcript at 75. The next day, after Jesperson addressed the employees and mentioned that some of the workers needed to get

---

**10.** According to the office employee, Walter said, "Well, none of my employees are [sic] going to show up and that you can take the letter and shove it up your ass." Transcript at 122. On cross-examination, she admitted that Walter might have said, "They can shove this up their ass." *Id.* at 124. Walter testified that he said, "Well, they might as well stick this up their 'ass.' " *Id.* at 48.

**11.** The Board's attempt to point to other evidence of the Company's unlawful motive is unavailing. The Board notes that the Company did not attempt to either find out if Walter in fact delivered the notices or hear Walter's side of the story before deciding to discipline him. (Walter testified that he in fact did deliver the notices as asked and stated the questionable comment was

made jokingly.) However, the employee handbook mentions no right to a hearing before an employee can be suspended; further, Walter testified that he gave the office employee no indication that he would deliver the notices as requested. We also note that although Walter occasionally wore a Teamsters cap to work and professed his support for the union in a lawful meeting with a Company official, *see* Part IV, *supra*, there is no evidence he engaged in union activity.

**12.** In its brief, the Company argues that Phillips was fired for insubordination because of his failure to follow orders. However, Jesperson, the Company official who fired Phillips, testified that the termination was because of what Phillips said and his failure to apologize.

their hair trimmed, Phillips approached Jesperson to talk again about Phillips's hair. During this conversation, Jesperson made the comment discussed in Part III, *supra.* Nothing was said about the previous day's argument, nor about the words Phillips had used. After Phillips returned from his delivery route later that day, he was called into Jesperson's office where he was told that he was being fired for "being insubordinate for getting into [Jesperson's] face and saying 'bullshit.' " *Id.* at 84.

The Company argues that Phillips's use of profanity and his failure to apologize are the real reasons Phillips was fired. The Board, however, claims that this is merely a pretextual reason. After reviewing the record, we cannot say the Board's finding is not supported by substantial evidence.

Before work on February 13, the morning after the comment in question was made, Phillips agreed to sign a union petition and also agreed to talk to other employees about signing the petition. During the employee meeting that same morning, Jesperson told the workers that any problems should be discussed with him, and that he did not want any employee causing the Company to go down the drain. After that meeting, Phillips was approached by a couple of employees and explained the union petition to them. He and Jesperson then had another discussion about Phillips's hair. During this meeting, Jesperson related the union story discussed in Part III, *supra,* as well as telling Phillips that "you guys think you're so smart, trying to organize this union stuff, this union bull." Transcript at 82. At no time during this discussion was Phillips's profanity on February 12 discussed. According to Phillips, the meeting ended with Jesperson asking Phillips to go halfway on the hair issue, telling Phillips he might be fired for not

following orders, and asking Phillips to talk to Jesperson at the end of the day to let him know what Phillips had decided to do. Jesperson never told Phillips that an apology was in order.

When Phillips returned from his route, he was told to meet with Jesperson. Jesperson then informed him that he was being fired for "being insubordinate for getting into [Jesperson's] face and saying 'bullshit.' " Transcript at 84. Phillips told Jesperson that he thought they were going to discuss the matter further, but Jesperson said that he did not want to discuss the matter further.

▮ The ALJ gives three primary reasons for his finding of a section 8(a)(3) violation. First, the comment in question occurred on February 12, and was not mentioned on either that day or during the first meeting between Phillips and Jesperson on February 13. The first time that Jesperson told Phillips that the comment was objectionable was when he was told he was being fired. This gives rise to a strong suspicion that the claimed reason for the termination was merely a pretext, because Phillips became overtly active in the union on February 13. Second, Jesperson testified that after the February 12 comment, he discussed the situation with Dave Marks, Phillips's direct supervisor, and told Marks that he would give Phillips a chance to apologize for the remark. On direct testimony, however, Marks denied having any such conversation with Jesperson. This, coupled with the ALJ's determination that Jesperson's testimony was less than credible,[13] supports the ALJ's finding that the profanity and lack of apology for it were merely pretextual reasons for firing Phillips. Third, on the morning of February 13, Jesperson told Phillips that he did not want to fire Phillips and that he was a

**13.** *See* Part III, *supra* (discussing the ALJ's credibility decision vis a vis Jesperson and Phillips). In addition, on direct testimony, Jesperson stated that he specifically told Phillips on February 12, "Mark, you've got to get your hair cut." Transcript at 131. He also testified that Phillips "hollered, 'bullshit' ... and slammed the door."

*Id.* On cross-examination, however, when confronted with a statement he had prepared on the incident on February 13, he admitted that he probably said, "Mark, I'd appreciate you getting your hair cut in the next several days," and that Phillips, after making his comment, "shut the door, hard." *Id.* at 137, 138.

good employee. Jesperson never told Phillips that he would be fired unless he apologized for his comment. In these circumstances, we are unable to say that the Board's finding of an unlawful discharge is unsupported by substantial evidence. It is therefore affirmed.

### VII.

■ Finally, the Company challenges the Board's finding that the Company violated section 8(a)(1) by unlawfully interrogating employee Phillips. The interrogation in question occurred nine days after Phillips was fired. The Company argues that since Phillips was no longer an employee of the Company, he is not covered by the Act. However, the Act covers "any individual whose work has ceased as ... because of any unfair labor practice." 29 U.S.C. § 152(3) (1988); *see* 29 U.S.C. § 158. Since Phillips's work with the Company ceased as a result of an unfair labor practice, *see* Part VI, *supra,* he is a covered employee. Thus, the interrogation of him concerning union activities was unlawful and a violation of section 8(a)(1).

### VIII.

To conclude, we grant enforcement of the Board's order in all respects except as to its holding regarding paragraphs five and six of the Company Letter and its holding concerning the interrogation and suspension of Walter. The matter is remanded to the Board for modification of its order in accordance with this opinion.